_____ FILED      _____ ENTERED
_____ LODGED     _____ RECEIVED

APR 27 2022   MV

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                          DEPUTY

SEALED

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| THE UNITED STATES OF AMERICA, STATE OF CALIFORNIA, STATE OF HAWAII, STATE OF NEW MEXICO, and STATE OF WASHINGTON, *ex rel.* JOHN DOE, | 22-CV- 565 PGM |
| Plaintiff-Relator, | **COMPLAINT AND JURY DEMAND FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** |
| v. | |
| DAIYA HEALTHCARE PLLC and BHUPINDER WALIA, M.D., | Date Action Filed: April 27, 2022 |
| Defendants. | **FILED UNDER SEAL** |

Receipt No. SEA107054

COMPLAINT & JURY DEMAND
FILED UNDER SEAL -

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

# TABLE OF CONTENTS

NATURE OF THE ACTION ................................................................................................ 1

JURISDICTION AND VENUE .......................................................................................... 2

PARTIES ............................................................................................................................ 3

LEGAL AND REGULATORY BACKGROUND .............................................................. 5

    A.    The Federal False Claims Act and Parallel State False Claims
        Statutes ................................................................................................................ 5

    B.    Medicare ............................................................................................................. 6

        1.    Medicare Part B ....................................................................................... 6

        2.    Medicare Part C ....................................................................................... 9

    C.    Medicaid ........................................................................................................... 11

        1.    California Medicaid – Medi-Cal ............................................................ 13

        2.    Hawaii Medicaid .................................................................................... 13

        3.    New Mexico Medicaid ........................................................................... 14

        4.    Washington Medicaid – Apple Health .................................................. 15

        5.    Medicaid Managed Care ........................................................................ 15

    D.    Billing and Reimbursement of Evaluation and Management
        ("E/M") Services in the Skilled Nursing/Nursing Facility Setting .................... 17

GENERAL ALLEGATIONS ............................................................................................ 22

    A.    Daiya's Business ............................................................................................... 22

    B.    Upcoding Visits ................................................................................................ 26

        1.    Daiya's Documentation and Coding "Training" ..................................... 26

        2.    Daiya's Documentation and Coding "Training" Was
            Successful ............................................................................................... 30

        3.    Daiya's Documentation and Coding Training in Practice ...................... 39

    C.    Medically Unnecessary Services ..................................................................... 46

COMPLAINT & JURY DEMAND
FILED UNDER SEAL - ii

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1.      "Gang" Visits / Hebuigh Frequency E/M Services.................................. 46

2.      Automatic Specialty Visits ...................................................... 48

D.      Defendants Caused False Claims to be Submitted and Paid for by
Medicare and Medicaid.................................................................... 53

CAUSES OF ACTION .......................................................................... 53

COUNT ONE — SUBMISSION OF FALSE CLAIMS 31 U.S.C. § 3729(A)(1)(A) ............... 53

COUNT TWO — MAKING FALSE STATEMENTS IN THE SUBMISSION  OF
FALSE CLAIMS
31 U.S.C. § 3729(a)(1)(B) ................................................................ 54

COUNT THREE — CALIFORNIA FALSE CLAIMS ACT
Cal. Gov't Code § 12651(a)(1) ........................................................ 55

COUNT FOUR — CALIFORNIA FALSE CLAIMS ACT
Cal. Gov't Code § 12651(a)(2) ........................................................ 55

COUNT FIVE — HAWAII FALSE CLAIMS ACT
Haw. Rev. Stat. § 661-21(a)(1) ....................................................... 56

COUNT SIX — HAWAII FALSE CLAIMS ACT
Haw. Rev. Stat. § 661-21(a)(2) ....................................................... 56

COUNT SEVEN — NEW MEXICO MEDICAID FALSE CLAIMS ACT
NM Stat. Ann. § 27-14-4(A) ........................................................... 57

COUNT EIGHT — NEW MEXICO MEDICAID FALSE CLAIMS ACT
NM Stat. Ann. § 27-14-4(C) ........................................................... 57

COUNT NINE — NEW MEXICO FRAUD AGAINST TAXPAYERS ACT
NM Stat. Ann. § 44-9-3(A)(1) .......................................................... 58

COUNT TEN — NEW MEXICO FRAUD AGAINST TAXPAYERS ACT
NM Stat. Ann. § 44-9-3(A)(2) .......................................................... 58

COUNT ELEVEN — WASHINGTON MEDICAID FRAUD FALSE CLAIMS ACT
RCW § 74.66.020(1)(a) ................................................................. 59

COUNT TWELVE — WASHINGTON MEDICAID FRAUD FALSE CLAIMS ACT
RCW § 74.66.020(1)(b) ................................................................. 59

PRAYER FOR RELIEF ........................................................................ 60

DEMAND FOR JURY TRIAL .................................................................. 61

COMPLAINT & JURY DEMAND
FILED UNDER SEAL - iii

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1       *Qui tam* relator, John Doe ("Relator"), brings this action against Defendants Daiya

2   Healthcare PLLC ("Daiya") and Bhupinder Walia, M.D. ("Dr. Walia") (collectively,

3   "Defendants"), under the federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729, *et seq.*; the

4   California False Claims Act ("CalFCA"), Cal. Gov't Code §§ 12650, *et seq.*; the Hawaii False

5   Claims Act ("HFCA"), Haw. Rev. Stat. §§ 661-21, *et seq.*; the New Mexico Medicaid False Claims

6   Act ("NMMFCA"), NM Stat. Ann. §§ 27-14-1, *et seq.*; the New Mexico Fraud Against Taxpayers

7   Act ("NMFATA"), NM Stat. Ann. §§ 44-9-1, *et seq.*; and the Washington Medicaid Fraud False

8   Claims Act ("WMFFCA"), RCW §§ 74.66, *et seq.* (collectively, the "relevant State FCAs"), on

9   behalf of the United States of America and the states of California, Hawaii, New Mexico, and

10  Washington (collectively, the "relevant States"), to recover funds of which the federal and state

11  governments have been defrauded by Defendants. The allegations herein are based upon Relator's

12  own direct and independent knowledge and an investigation undertaken by Relator's counsel.

13  Relator alleges as follows:

14  <center>**NATURE OF THE ACTION**</center>

15      1.    Relator brings this action against Defendants pursuant to the FCA and the relevant

16  State FCAs to recover payments made on claims submitted or caused to be submitted by

17  Defendants that resulted from their illegal conduct in providing post-acute and long-term care

18  services (i.e., nursing facility care) to Medicare and Medicaid beneficiaries residing in skilled

19  nursing facilities ("SNFs"), nursing facilities ("NFs"), and assisted living facilities ("ALFs")

20  located throughout the states of California, Hawaii, Idaho, New Mexico, Oregon, and Washington.

21      2.    Specifically, Defendants, by and through their healthcare employee-providers, (1)

22  systematically upcoded claims for evaluation and management ("E/M") services; and (2) furnished

23  medically unnecessary services by engaging in gang rounding—i.e., frequently provided services

24  to SNF, NF, and ALF patients when not warranted—and by furnishing specialty services (e.g.,

25  psych, pain management) when patients had no current need or indication for the service.

26

27

COMPLAINT & JURY DEMAND
FILED UNDER SEAL - 1

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

3.     As detailed below, Defendants knowingly engaged in this conduct and intentionally violated, and continue to violate Medicare's and Medicaid's rules and regulations governing nursing facility care services to Medicare and Medicaid beneficiaries.

4.     As a result of this unlawful conduct, Defendants have not only violated their conditions of participation in the Medicare and Medicaid programs but have also violated the conditions of payment on claims submitted for nursing facility care services provided to patient beneficiaries. Accordingly, all claims submitted to the Government resulting from Defendants' illegal conduct were in violation of the FCA and the relevant State FCAs.

## JURISDICTION AND VENUE

5.     Relator brings this action on behalf of the United States under the *qui tam* provisions of the FCA, as well as on behalf of the relevant States under the parallel *qui tam* provisions of the relevant State FCAs.

6.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a), which confer jurisdiction over actions brought under 31 U.S.C §§ 3729 and 3730. This Court has supplemental jurisdiction over the counts asserted under the relevant State FCAs pursuant to 28 U.S.C. § 1367 and 31 U.S.C. § 3732(b).

7.     This Court has personal jurisdiction over Defendants, and venue is proper in this District pursuant to 31 U.S.C. § 3732(a), because Defendants are found, transact business, and committed violations of 31 U.S.C. § 3729 in this District.

8.     This action is not based upon the prior public disclosure of allegations or transactions in a federal or state criminal, civil, or administrative hearing in which the Government or its agent is a party; in a congressional, Government Accountability Office, or other Federal or state report, hearing, audit, or investigation; in the news media; or in any other form as the term "publicly disclosed" is defined in either the FCA or the relevant State FCAs.

9.     To the extent there has been a public disclosure unknown to Relator, Relator is an original source within the meaning of 31 U.S.C. § 3730(e)(4), Cal. Gov't Code § 12652(d)(3)(C), Haw. Rev. Stat. § 661-31(c), NM Stat. Ann. § 27-14-10(C), and RCW § 74.66.080(2)(b).

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

10.     Pursuant to 31 U.S.C. § 3730(b)(2), along with this Complaint, Relator prepared and has served on the Attorney General of the United States and the United States Attorney for the Western District of Washington a written disclosure of all material evidence and information currently in Relator's possession. Relator has also served this Complaint and written disclosure on the relevant States pursuant to Cal. Gov't Code § 12652(c)(3), Haw. Rev. Stat. § 661-25(b), NM Stat. Ann. § 27-14-7(C), NM Stat. Ann. § 44-9-5(C), and RCW § 74.66.050(2), respectively. The written disclosure is supported by material evidence known to Relator at the time of filing this Complaint establishing the existence of Defendants' fraudulent conduct, which resulted in economic loss to the United States and the relevant States. That information includes attorney-client communications and work product of Relator's attorneys and was submitted to those federal and state officials in their capacity as potential co-counsel in this action.

## PARTIES

11.     Relator John Doe ("Relator") is an Advanced Practice Registered Nurse ("APRN") and has been employed by Defendant Daiya since the fall of 2020, furnishing post-acute and long-term care services to patients residing in Defendant's contracted partner facilities.

12.     Defendant Daiya Healthcare PLLC ("Daiya") is a Washington professional limited liability corporation with its corporate headquarters located at 11120 NE 33rd Place, Suite 202 in Bellevue, Washington. Founded in 2019 by Dr. Bhupinder Walia, who serves as the company's CEO, Daiya promotes itself as a physician owned multi-specialty provider group, offering services in post-acute and long-term care centers throughout the United States. Currently, Daiya has contracts to provide post-acute and long-term care with close to 100 SNFs, NFs, and ALFs located throughout California, Hawaii, Idaho, New Mexico, Oregon, and Washington. To carry out its contractual duties in furnishing services to facility resident-patients, Daiya employs healthcare professionals, including board-certified physicians, nurse practitioners, registered nurses, pharmacists, and medical assistants, to work with its partner SNFs, NFs, and ALFs.

13.     Defendant Dr. Bhupinder Walia ("Dr. Walia") is a Washington state resident and the founder and CEO of Daiya. At all times relevant to this Complaint, Dr. Walia oversaw the

COMPLAINT & JURY DEMAND
FILED UNDER SEAL - 3

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

implementation of coding and documentation policies that led to the submission of false claims to the Medicare and Medicaid programs for upcoded nursing facility E/M services, as well as medically unnecessary services furnished by Daiya's employee-providers to patients in its partner-facilities. Dr. Walia was also intimately involved in monitoring employee-providers' performance to ensure that employee-providers' were coding their encounters at levels that would always get his company the highest reimbursement rates.

14.    The United States is a real party in-interest in this action because, through the government-funded Medicare and Medicaid programs, it paid the false claims alleged herein. Medicare is a federal health insurance program administered by the Centers for Medicare & Medicaid Services ("CMS") for the elderly and disabled. *See* 42 U.S.C. §§ 1395–1395hhh. Medicaid is a jointly funded federal and state public-assistance program that pays for certain medical expenses incurred by low-income patients. *See* 42 U.S.C. §§ 1396–1396v. The federal portion of the Medicaid program is administered by CMS.

15.    The State of California is a real party-in-interest to this action under the CalFCA, Cal. Gov't Code §§ 12650, *et seq.*, and ultimately paid a portion of the false Medicaid claims alleged herein. *See* 42 U.S.C. §§ 1396–1396v.

16.    The State of Hawaii is a real party-in-interest to this action under the HFCA, Haw. Rev. Stat. §§ 661-21, *et seq.*, and ultimately paid a portion of the false Medicaid claims alleged herein. *See* 42 U.S.C. §§ 1396–1396v.

17.    The State of New Mexico is a real party-in-interest to this action under the NMMFCA, NM Stat. Ann. §§ 27-14-1, *et seq.*, as well as the NMFATA, NM Stat. Ann. §§ 44-9-1, *et seq.*, and ultimately paid a portion of the false Medicaid claims alleged herein. *See* 42 U.S.C. §§ 1396–1396v.

18.    The State of Washington is a real party-in-interest to this action under the WMFCA, RCW §§ 74.66, *et seq.*, and ultimately paid a portion of the false Medicaid claims alleged herein. *See* 42 U.S.C. §§ 1396–1396v.

COMPLAINT & JURY DEMAND
FILED UNDER SEAL - 4

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

**LEGAL AND REGULATORY BACKGROUND**

**A.    The Federal False Claims Act and Parallel State False Claims Statutes**

19.    Under the FCA, 31 U.S.C. §§ 3729–33, an individual who, or entity that, *inter alia*, "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," *id.* § 3729(a)(1)(A); or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," *id.* § 3729(a)(1)(B), is liable to the United States for civil penalties and treble damages.

20.    The FCA defines a "claim" to include "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest[.]" *Id.* § 3729(b)(2)(A)(i)–(ii).

21.    The FCA defines the terms "knowing" and "knowingly" to mean "that a person, with respect to information (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." *Id.* § 3729(b)(1)(A)(i)–(iii). The FCA does not require proof of specific intent to defraud. *Id.* § 3729(b)(1)(B).

22.    The FCA provides that the term "material" means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Id.* § 3729(b)(4).

23.    The standard of proof under the FCA is preponderance of the evidence. 31 U.S.C. § 3731(d).

24.    Under the FCA, the United States is entitled to recover three times the amount of each false claim and, for each false claim or overpayment, a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of

COMPLAINT & JURY DEMAND
FILED UNDER SEAL - 5

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1990. *See* 15 C.F.R. § 6.3(a)(3) (setting forth the current civil penalties level of not less than $12,537 and not more than $25,076 for violations of the FCA).

25.     The relevant States have enacted their own false claims statutes, which parallel the federal statute and provide comparable relief to the respective state for the submission of false and fraudulent claims. *See* Cal. Gov't Code §§ 12650, *et seq.*; Haw. Rev. Stat. §§ 661-21, *et seq.*; NM Stat. Ann. §§ 27-14-1, *et seq.*; NM Stat. Ann. §§ 44-9-1, *et seq.*; RCW §§ 74.66, *et seq.*

**B.      Medicare**

26.     In 1965, Congress enacted the Health Insurance for the Aged and Disabled Act, 42 U.S.C. §§ 1395, *et seq.*, known as the Medicare program, as part of Title XVIII of the Social Security Act, to provide health insurance coverage for people aged 65 or older and for people with certain disabilities or afflictions. *See* 42 U.S.C. §§ 426, 426a. Medicare is administered by CMS.

27.     The Medicare program has four parts: Part A, Part B, Part C, and Part D. Relevant to this Complaint, Defendants have submitted, or caused to be submitted claims under Medicare Part B and Part C.

**1.      Medicare Part B**

28.     Medicare Part B, which is part of "Original Medicare," covers medical and other health services, including physician and non-physician practitioner ("NPP") services, on a "fee-for-service" basis, meaning physicians and NPPs are paid for each covered service they provide to a Medicare beneficiary.

29.     The amount of payment for physician and NPP services furnished to a Medicare Part B beneficiary is based on an approved fee-schedule, which is updated on an annual basis. 42 U.S.C. § 1395w-4.

30.     To assist in the administration of Part B of the Medicare program, CMS contracts with Medicare administrative contractors ("MACs"). *Id.* § 1395u. MACs are responsible for processing the payment of Medicare Part B claims to providers on behalf of CMS. *Id.* Noridian Healthcare Solutions, LLC ("Noridian") is the current MAC in Daiya's jurisdictions responsible for the payment of Medicare Part B claims to Daiya on behalf of CMS.

COMPLAINT & JURY DEMAND
FILED UNDER SEAL - 6

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

31.     Medicare covers medical and other health services, which includes post-acute and long-term care services, when performed by the beneficiary's treating physician or NPP operating within the scope of their authority granted by the State. 42 C.F.R. § 410.20.

32.     Medicare does not pay for items or services that are not medically reasonable and necessary for the "diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A); 42 C.F.R. § 411.15(k); Medicare Benefit Policy Manual Ch. 16 § 20.[1]

33.     During all times relevant to this Complaint, the Medicare program reimbursed for nursing facility care services provided to beneficiaries residing in Daiya's partner facilities.

34.     Physicians/NPPs who wish to bill Medicare for the services they furnish to their patient-beneficiaries must enroll in the program by completing the provider application Form CMS-855I.[2] By enrolling in the Medicare Program, physicians/NPPs certify that they agree to abide by the applicable Medicare laws, regulations, and program instructions.[3] Enrolled physicians/NPPs further certify that they understand that for a claim to be paid, the claim and the underlying services must comply with the Medicare laws, regulations, and program instructions.[4]

35.     To obtain Medicare reimbursement for physician services, providers submit a claim on Form CMS-1500 ("CMS-1500")[5] or file claims via the 837P electronic process ("837P"). Among the information a provider includes via CMS-1500 or 837P are certain five-digit codes, including Current Procedural Terminology ("CPT")[©] codes and Healthcare Common Procedure Coding System ("HCPCS") Level II codes, that identify the services rendered and for which reimbursement is sought, and the unique billing identification number of the "rendering provider" and the "referring provider or other source."[6]

---

[1] *Medicare Benefit Policy Manual: Chapter 16 - General Exclusions From Coverage* at pp. 3–4, CMS, https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/bp102c16.pdf (last visited Apr. 25, 2022).

[2] *Form CMS-855I: Medicare Enrollment Application; Physicians and Non-Physician Practitioners*, CMS, https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/Downloads/cms855i.pdf (last visited Apr. 25, 2022).

[3] *Id.* at p. 23.

[4] *Id.*

[5] *Form CMS-1500: Health Insurance Claim Form*, CMS, https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/Downloads/CMS1500.pdf (last visited Apr. 25, 2022).

[6] *Id.* at p. 1 (boxes 17, 24.J).

COMPLAINT & JURY DEMAND
FILED UNDER SEAL - 7

36.     Any provider seeking Medicare reimbursement through Part B must sign the CMS-1500 or 837P. By signing the CMS-1500 and submitting the claim for payment from Medicare, the provider certifies, among other things, that: the information on the claim form is "true, accurate and complete"; "[the] claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment"; and the "services on this form were medically necessary and personally furnished by me or were furnished incident to my professional service by my employee under my direct supervision."[7]

37.     The CMS-1500 also requires providers to acknowledge that: "Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."[8]

38.     Providers who submit claims electronically under 837P must also execute an Electronic Data Interchange ("EDI") Enrollment Form with CMS. By executing the EDI Enrollment Form, a provider agrees to "be responsible for all Medicare claims submitted to CMS . . . by itself, its employees, or its agents," and to "submit claims that are accurate, complete, and truthful."[9]

39.     By executing an EDI Enrollment Form, a provider also acknowledges "that all claims will be paid from Federal funds, that the submission of such claims is a claim for payment under the Medicare program, and that anyone who misrepresents or falsifies or causes to be misrepresented or falsified any record or other information relating to that claim that is required pursuant to this agreement may, upon conviction, be subject to a fine and/or imprisonment under applicable Federal law."[10]

---

[7] CMS-1500, *supra* note 5, at p. 2.
[8] *Id.*
[9] *Medicare Claims Processing Manual: Chapter 24 - General EDI and EDI Support Requirements, Electronic Claims, and Mandatory Electronic Filing of Medicare Claims* at pp. 18, 19, CMS, https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/clm104c24.pdf (last visited Apr. 25, 2022).
[10] *Id.* at p. 19.

COMPLAINT & JURY DEMAND
FILED UNDER SEAL - 8

40.     Indeed, as a Medicare participating provider, Daiya (including on behalf of its employee-providers) was obligated to understand and certify its compliance with all applicable Medicare laws, regulations, and program instructions as a condition of participation in Medicare and as a condition of payment of Medicare reimbursements.

41.     Because it is not feasible for Medicare personnel to review every patient's medical record for the millions of claims for payments they receive from providers, the program relies on providers to comply with Medicare requirements and trusts providers to submit truthful and accurate certifications and claims.

42.     Moreover, because MACs are required to pay "clean claims"—i.e., claims that have no defect or impropriety (including any lack of any required substantiating documentation) or particular circumstance requiring special treatment that prevents timely payment—within thirty days of receipt, 42 U.S.C. § 1395u(c)(2), generally, once a provider submits the CMS-1500 or electronic 837P to Medicare, the claim is paid directly to the provider without any review of supporting documentation, including medical records.

**2.      Medicare Part C**

43.     Medicare Part C, commonly known as the "Medicare Advantage" program, is the "all-in-one" alternative to Original Medicare through which CMS authorizes private insurers to offer health insurance plans to individuals who are eligible for Original Medicare. The private insurance plans offered through the Medicare Advantage program are paid for in full by federal government funds.

44.     The private insurers offering Medicare Advantage ("MA") plans, known as Medicare Advantage organizations ("MAOs"), contract with CMS to administer Medicare Part C benefits under a managed-care model rather than the traditional fee-for-service model, and are required to provide the same level of service as available through Original Medicare. *See* 42 U.S.C. § 1395w-22(a)(1) (providing that MA plans shall provide to enrollees items and services for which benefits are available under Medicare Part A and Part B to individuals entitled to benefits under

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

Part A and enrolled under Part B, with similar cost-sharing limitations). All the protections and regulations applicable to Original Medicare apply to the practices of the MAOs.

45.     The types of plans of health insurance that may be offered by MAOs include a health maintenance organization ("HMO"), a regional or local preferred provider organization ("RPPO" or "LPPO"), a medical savings account ("MSA"), or a private fee-for-service ("PFFS") plan. 42 U.S.C. § 1395w-21(a)(2).

46.     Pursuant to their contracts with CMS, the MAOs are paid a fixed, monthly capitated rate based on the number of Medicare beneficiaries they service and the geographic location, income status, gender, age, and health status of those beneficiaries.

47.     In addition, the MAOs' contractual obligations and the applicable regulations require that the MAOs have the proper systems in place to ensure that they only pay for services that are determined to be medically necessary and reasonable based on objective medical criteria. *See* 42 C.F.R. § 422.101 (requiring MAOs to comply with original Medicare coverage guidelines, which include payment for services that are only medically necessary); *id.* § 422.504 (requiring MAOs to provide all benefits covered by Medicare in a manner consistent with professionally recognized standards of health care).

48.     MAO contracts with providers must include a provision requiring that any services or other activity performed by such providers are consistent and comply with the MA organization's contractual obligations with CMS. *Id.* § 422.504(i)(3). MAO contracts with providers must also include accountability provisions, including the requirement that providers and their subcontractors must comply with the Medicare laws, regulations, and CMS instructions. 42 C.F.R. § 422.504(i)(4)(v); Medicare Managed Care Manual Ch. 11 § 100.4.[11]

49.     MAOs are further obligated to comply with federal laws and regulations designed to prevent or ameliorate fraud, waste, and abuse including, but not limited to the FCA. Medicare

---

[11] *Medicare Managed Care Manual: Chapter 11 - Medicare Advantage Application Procedures and Contract Requirements* at p. 25, CMS, https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/mc86c11.pdf (last visited Apr. 25, 2022).

COMPLAINT & JURY DEMAND
FILED UNDER SEAL - 10

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

Managed Care Manual Ch. 11 § 120.[12] MAOs receiving federal payments under MA contracts, and contractors (such as Daiya) paid by an MAO to fulfill its obligations under its MA contract are subject to certain laws that are applicable to individuals and entities receiving federal funds, such as, for example, the FCA.[13] Accordingly, MAOs must inform contracted providers, such as Daiya, that payments they receive are, in whole or in part, from federal funds.[14]

50.     Medical services furnished to the beneficiaries who are enrolled in MA plans are billed to the plans' respective MAOs for payment. All such insurance claims paid by MAOs, as well as the MAOs' associated administrative costs, are paid using funds provided by CMS through the capitated payments.

51.     The contracts between MAOs and providers must include a prompt payment provision, the terms of which are developed and agreed to by both the MAO and the provider. 42 C.F.R. §§ 422.504(c), 422.520(b). Thus, much like the situation in which a provider submits a claim for payment under Medicare Part B, generally, once a contracted provider submits a claim to the MA plan, the claim is paid directly to the provider without any review of supporting documentation, including medical records.

**C.     Medicaid**

52.     Pursuant to Title XIX of the Social Security Act, 42 U.S.C. §§ 1396, *et seq.*, the Medicaid Program was established in 1965 as a public assistance program jointly financed by the federal and state governments to provide medical assistance to low-income, blind, or disabled persons, or to members of families with dependent children or qualified pregnant women or children.

53.     CMS administers Medicaid at the federal level and requires all states to provide certain mandatory services (e.g., hospital, physician, and nursing facility services).

54.     Because states must also provide funding for their respective Medicaid program, each state chooses several optional services they wish to provide in addition to the mandatory

---

[12] *Id.* at p. 43.
[13] *Id.* at pp. 43–44.
[14] *Id.*

COMPLAINT & JURY DEMAND
FILED UNDER SEAL - 11

services prescribed by CMS. Moreover, within broad federal rules, states are also afforded considerable flexibility to determine eligibility, payment levels for services, and administrative and operating procedures.

55.     Funding for Medicaid is shared between the federal and state governments. The federal share of each state's Medicaid program varies state by state and may change each year. Among the states, the federal share is at least 50%, and as high as over 80%. For example, the federal share for fiscal year 2022 (ending September 30) is approximately 56.20% for California, 59.84% for Hawaii, 79.91% for New Mexico, and 56.20% for Washington.[15]

56.     Providers that wish to participate in a state's Medicaid program must sign a Medicaid provider agreement with that state. Although there are variations in the provider agreements among the states, all states require prospective Medicaid providers to agree that they will comply with all Federal and State Medicaid requirements, including the fraud and abuse provisions. A provider who fails to comply with these statutes and regulations is not entitled to payment for services rendered to Medicaid patients.

57.     By becoming a participating Medicaid provider, Daiya (including on behalf of its employee-providers), like all other such providers, agreed to abide by all laws, regulations, and procedures applicable to the Medicaid program, including the laws and regulations governing reimbursement for services or supplies furnished as well as the provisions regarding fraud and abuse.

58.     To carry out the mandates of the Medicaid program, the relevant state agency pays providers directly for medical care and services furnished to eligible Medicaid recipients, with the states obtaining the federal share of the payment from accounts that draw on the United States Treasury. 42 C.F.R. §§ 430.0–.30.

---

[15] *Federal Medical Assistance Percentage (FMAP) for Medicaid and Multiplier*, Kaiser Family Foundation, https://www.kff.org/medicaid/state-indicator/federal-matching-rate-and-multiplier/?currentTimeframe=1&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D (last visited Apr. 25, 2022).

COMPLAINT & JURY DEMAND
FILED UNDER SEAL - 12

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

59.     State Medicaid programs pay for physician services, such as the services of the type Daiya furnishes, on a fee-for-service basis under a fee schedule established by the relevant state agency. *See, e.g.*, California Code of Regulations ("CCR") Tit. 22, § 51503; Hawaii Administrative Rules ("HAR") Tit. 17, §§ 17-1739.1-6.1, 17-1739.2-4(b); New Mexico Administrative Code ("NMAC") Tit. 8, §§ 8.302.1.15, 8.310.3.11; Washington Administrative Code ("WAC") Tit. 182, § 182-502-0100. While fee schedules are the predominant method of Medicaid physician payment, the basis for each fee schedule varies and there is considerable variation in fees across states. Federal rules do not prescribe how physicians should be paid or how much they should be paid, but only require that Medicaid payment policies should promote efficiency, economy, quality, access, and safeguard against unnecessary utilization.

**1.     California Medicaid – Medi-Cal**

60.     In California, providers participating in the Medicaid program, known as Medi-Cal, submit claims for covered services rendered to Medicaid beneficiaries to the California Department of Health Care Services for direct payment.

61.     Medi-Cal covers health care services, including the services of the type that Daiya's providers furnish, when they are reasonable and necessary to protect life, to prevent significant illness or significant disability, or to alleviate severe pain through the diagnosis or treatment of disease, illness or injury. 22 CCR § 51303.

**2.     Hawaii Medicaid**

62.     Providers participating in Hawaii's Medicaid program, submit claims for covered services rendered to Medicaid beneficiaries to the Med-QUEST Division of Hawaii's Department of Human Services for direct payment.

63.     Hawaii's Medicaid program covers the cost of physician services of the type that Daiya's providers furnish when they are medically necessary and when the services are provided by a physician at locations including, for purposes of this action, an approved skilled nursing or intermediate care facility or a licensed care home or adult family boarding home. HAR § 17-1737-5; *see also id.* §§ 17-1737-84, 17-1739.1-3.

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

64.     Under Hawaii's Medicaid program, "[m]edical necessity" means:

> those procedures and services, as determined by the department, which are considered to be necessary and for which payment will be made. Medically necessary health interventions (services, procedures, drugs, supplies, and equipment) must be used for a medical condition. There shall be sufficient evidence to draw conclusions about the intervention's effects on health outcomes. The evidence shall demonstrate that the intervention can be expected to produce its intended effects on health outcomes. The intervention's beneficial effects on health outcomes shall outweigh its expected harmful effects. The intervention shall be the most cost-effective method available to address the medical condition. Sufficient evidence is provided when evidence is sufficient to draw conclusions, if it is peer-reviewed, is well-controlled, directly or indirectly relates the intervention to health outcomes, and is reproducible both within and outside of research settings.

*Id.* § 17-1700.1-2.

### 3.   New Mexico Medicaid

65.     In New Mexico, providers participating in the Medicaid program, submit claims for covered services rendered to Medicaid beneficiaries to the Medical Assistance Division of the New Mexico Human Services Department for direct payment.

66.     New Mexico's Medicare program pays for covered services that are medically necessary for the diagnosis and treatment of an illness or injury as indicated by the Medicaid beneficiary's condition, and that are furnished within the limits of the state's administrative rules and benefits and within the scope and practice of the provider's professional standards. NMAC §§ 8.310.2.12, 8.310.3.10; *see also id.* § 8.302.1.9.

67.     In New Mexico, "[m]edical necessary services" are:

> clinical and rehabilitative physical or behavioral health services that:
>
> (1)     are essential to prevent, diagnose or treat medical conditions or are essential to enable an eligible recipient to attain, maintain or regain functional capacity;
>
> (2)     are delivered in the amount, duration, scope and setting that is clinically appropriate to the specific physical and behavioral health care needs of the eligible recipient;
>
> (3)     are provided within professionally accepted standards of practice and national guidelines; and

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

(4)    are required to meet the physical and behavioral health needs of the eligible recipient and are not primarily for the convenience of the eligible recipient, the provider or the payer.

*Id.* § 8.302.1.7.

### 4.    Washington Medicaid – Apple Health

68.    In Washington state, providers participating in the Medicaid program, known as Apple Health, submit claims for covered services rendered to Medicaid beneficiaries to the Washington State Health Care Authority for direct payment.

69.    Washington's Medicaid agency covers physician's services of the type that Daiya's providers furnish when they are (a) within the scope of the beneficiary's Apple Health program, and (b) medically necessary. WAC § 182-531-0100.

70.    Washington's Medicaid agency defines a "[m]edically necessary" service as a:

requested service which is reasonably calculated to prevent, diagnose, correct, cure, alleviate or prevent worsening of conditions in the client that endanger life, or cause suffering or pain, or result in an illness or infirmity, or threaten to cause or aggravate a handicap, or cause physical deformity or malfunction. There is no other equally effective, more conservative or substantially less costly course of treatment available or suitable for the client requesting the service. For the purposes of this section, "course of treatment" may include mere observation or, where appropriate, no medical treatment at all.

*Id.* § 182-500-0070.

71.    Payments due for the provision of eligible services are subject to the prompt payment provisions contained in each state's Medicaid plan. 42 C.F.R. § 447.45. Generally, state Medicaid agencies are required to pay providers within thirty days of the receipt of a claim for reimbursement, absent other unusual circumstances.

72.    In submitting claims to state Medicaid agencies, Medicaid providers, like Daiya, make the same certifications described above as Medicare providers.

### 5.    Medicaid Managed Care

73.    In addition to each state's Medicaid fee-for-service program and similar to the Medicare Advantage Program described above, pursuant to Medicaid Managed Care, 42 C.F.R.

COMPLAINT & JURY DEMAND
FILED UNDER SEAL - 15

Part 438, the relevant States, like most other states, are authorized by CMS to award contracts to private companies to offer health insurance plans to individuals who are eligible for Medicaid. These private insurance companies then generate funding requests to the state's Medicaid program, which in turn obtains federal funds from the United States.

74.     The private insurers offering plans through Medicaid Managed Care, known as managed care organizations ("MCOs"), contract with state agencies to administer Medicaid Managed Care benefits, and are required to provide the same level of service as available through traditional Medicaid. All of the protections and regulations applicable to Medicaid apply to the practices of the MCOs. Pursuant to those contracts, the MCOs are paid a capitated rate based on the number of Medicaid beneficiaries they service and the level of sickness of those beneficiaries.

75.     Medical care and procedures furnished to beneficiaries who participate in the MCOs' Medicaid Managed Care plans are billed to the MCOs for payment. Any and all such insurance claims paid by MCOs, as well as the MCOs' associated administrative costs, are paid using funds provided by CMS and the states through the capitated payments.

76.     The MCOs' contractual obligations and the applicable regulations require that the MCOs have the proper system in place to ensure that they only pay for services that are determined to be medically necessary and reasonable based on objective medical criteria; that requirement also applies to entities that contract with the MCOs. *See, e.g.*, 42 U.S.C. § 1396a(a)(30)(A); 42 C.F.R. § 438.210(a)(5).

77.     Like the prompt payment provisions contained in each state's Medicaid plan with respect to claims from providers directly submitted to and paid by the state agency, MCOs that administer plans to eligible beneficiaries are also subject to similar prompt pay provisions upon submission of claims by providers. 42 C.F.R. § 447.46.

78.     In submitting claims to MCOs, Medicaid providers, like Daiya, make the same certifications described above as Medicare providers.

COMPLAINT & JURY DEMAND
FILED UNDER SEAL - 16

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

**D.     Billing and Reimbursement of Evaluation and Management ("E/M") Services in the Skilled Nursing/Nursing Facility Setting**

79.     Nursing facility services furnished by physicians or qualified NPPs who are not employed by the facility, such as Daiya's providers in this case, are covered by Medicare Part B and paid at the Medicare Physician Fee Schedule rates.[16] For Medicaid beneficiaries, such services furnished by physicians or qualified NPPs who are not employed by the facility are covered and separately reimbursed at the particular state's fee schedule rates. *See supra* ¶ 59. To the extent these services are furnished by non-facility physicians/NPPs to managed care beneficiaries, they are covered by the particular managed care plan (MA or state MCO) and reimbursed at that plan's negotiated rate for the particular service.

80.     Medicare and Medicaid providers who seek reimbursement for E/M services furnished to SNF or NF residents are required to report one of the range of CPT codes for nursing facility services from 99304 to 99318 on their claims, *see* 45 C.F.R. § 162.1002, and are distinct from the Office/Outpatient E/M visit codes, CPT 99201-205 and 99211-215, which are to be used for services furnished in the office setting. Of primary relevance to this action are the Subsequent Nursing Facility Care ("SNFC") codes, CPT 99307–99310.[17]

81.     There are only two types of E/M services that are to be billed under the SNFC CPT codes, 99307–99310: federally mandated visits in a SNF and NF that are to occur at least once every thirty days for the first ninety days after admission and at least once every sixty days thereafter and all other medically necessary visits.[18] A physician or NPP may bill medically

---

[16] *Medicare Claims Processing Manual: Chapter 6 - SNF Inpatient Part A Billing and SNF Consolidated Billing* § 20.1.1, CMS, https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/clm104c06.pdf (last visited Apr. 25, 2022).

[17] The Initial Nursing Facility Care CPT codes 99304–99306 are used to report the initial comprehensive visit in a SNF and NF. *Medicare Claims Processing Manual: Chapter 12 - Physicians/Nonphysician Practitioners* § 30.6.13, CMS, https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/clm104c12.pdf (last visited Apr. 25, 2022). The initial comprehensive visit is a federally mandated visit that must occur no later than thirty days after a resident's admission into the SNF or NF and is the initial visit during which the physician or NPP completes a thorough assessment, develops a plan of care and writes or verifies admitting orders for the resident. *Id.* CPT codes 99315–99316 are used to report E/M discharge day management visits. *Id.* CPT code 99318 is used to report an annual nursing facility assessment visit on the required schedule of visits on an annual basis. *Id.*

[18] *See id.*; Letter from CMS Director of Survey and Certification Group to State Survey Agency Directors, Ref: S&C: 13-15-NH, CMS (Mar. 8, 2013), https://www.cms.gov/Medicare/Provider-Enrollment-and-Certification/SurveyCertificationGenInfo/Downloads/Survey-and-Cert-Letter-13-15-.pdf.

COMPLAINT & JURY DEMAND
FILED UNDER SEAL - 17

1    necessary E/M visits even if the E/M service is provided prior to the initial federally mandated

2    visit.[19]

3         82.    To bill any code, the services furnished must meet the definition of the code.[20]

4         83.    The last digits of each code within this range indicates the "Level" of E/M service

5    being provided. For example, an E/M service billed under CPT 99310 is considered a Level 10

6    service.

7         84.    Within the range of SNFC E/M codes, reimbursement increases from low to high

8    within each range, such that a Level 9 or 10 visit is more intensive and garners a higher

9    reimbursement than a Level 7 visit. The appropriate E/M code depends primarily on the following

10   key elements: the medical history *taken*, the physical examination *performed*, and the *complexity*

11   of the medical decision-making involved.

12        85.    For example, to select and therefore bill and be paid for CPT 99310, a provider

13   must satisfy the requirements for two of the three key components: comprehensive interval history,

14   comprehensive physical exam, and high complexity medical decision-making.[21] CPT 99310

15   requires the provider to undertake a:

16   - 1a. Comprehensive Interval History: includes (a) a statement of the chief

17     complaint/reason for visit; (b) an extended History of Present Illness ("HPI"); (c) a

18     complete review of systems ("ROS"); and (d) a complete past, family and social

19     history ("PFSH");

20   - 1b. Comprehensive physical exam: includes a general, multi-system exam or

21     complete examination of a single organ system;

22   - 2. Medical Decision making of High complexity:    includes (a) extensive

23     management options for diagnosis or treatment; (b) an extensive amount of data to

24

25   _____

26   [19] *Id.*

[20] *Evaluation and Management Services Guide* at p. 7, CMS (Feb. 2021), https://www.cms.gov/outreach-and-education/medicare-learning-network-mln/mlnproducts/downloads/eval-mgmt-serv-guide-icn006764.pdf.

27   [21] *See CPT Code 99310: Subsequent Nursing Facility Care Fact Sheet*, CGS Admins., LLC (revised Feb. 13, 2019), https://www.cgsmedicare.com/partb/mr/pdf/99310.pdf.

COMPLAINT & JURY DEMAND
FILED UNDER SEAL - 18

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

be reviewed; or (c) a high risk of complications and/or morbidity or mortality; and/or

- 3. Presenting Problem (Severity): Patient must have an unstable/significant new problem requiring immediate physician attention.[22]

86.     Time may be used as the controlling, but not sole factor for selecting an E/M code when counseling and/or coordination of care dominates (more than 50%) of the encounter.[23] To bill CPT 99310 based on time, a provider or NPP must spend 35 minutes or more of total face-to-face time on the date of the encounter, over 50% of which is spent on counseling and/or coordination of care.[24]

87.     As with all E/M services, medical necessity of a service is the overarching criterion for payment in addition to the individual requirements of a CPT code. It would not be medically necessary or appropriate to bill a higher level of E/M service when a lower level of service is warranted. The volume of documentation should not be the primary influence upon which a specific level of service is billed. Documentation should support the level of service reported. The service should be documented during, or as soon as practicable after it is provided in order to maintain an accurate medical record.[25]

88.     The mere presence of inactive or chronic conditions does not constitute medical necessity for any setting (home, rest home, office, etc.).[26]

89.     Further to the medical necessity of E/M services and the level of E/M service billed, the MAC in Daiya's jurisdictions, Noridian, states:

> Services rendered should be billed to Medicare based on the medical necessity of the visit. If the visit does not necessitate the detail of documentation required to meet CPT code 99XXX a lower level of service should be billed. **Do not** include

---

[22] *See id.*

[23] *1997 Documentation Guidelines for Evaluation and Management Services* at p. 4, CMS, https://www.cms.gov/outreach-and-education/medicare-learning-network-mln/mlnedwebguide/downloads/97docguidelines.pdf (last visited Apr. 25, 2022).

[24] *Supra* note 21 at p. 1.

[25] *See supra* note 17 § 30.6.1.

[26] *See Home and Domiciliary Visits*, Noridian (last updated Apr. 20, 2021), https://med.noridianmedicare.com/web/jfb/specialties/em/home-and-domiciliary-visits#medical-necessity.

COMPLAINT & JURY DEMAND
FILED UNDER SEAL - 19

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

additional components in the record for the sole purpose of meeting a specific CPT code.

Medical necessity cannot be quantified using a points system. Determining the medically necessary level of service (LOS) involves many factors and is not the same from patient to patient and day to day. Medical necessity is determined through a culmination of vital factors, including, but not limited to:

- Clinical judgment
- Standards of practice
- Why the patient needs to be seen (chief complaint)
- Any acute exacerbations/onsets of medical conditions or injuries
- The stability/acuity of the patient
- Multiple medical co-morbidities
- And the management of the patient for that specific DOS [dates of service.][27]

90.     Like Medicare, state Medicaid programs require providers generally to follow the CPT Manual or the 1995 or 1997 *Documentation Guidelines for Evaluation and Management Services* (the "1995 E/M Guidelines" or "1997 E/M Guidelines," respectively) when coding and billing for E/M services in the SNF or NF setting.

91.     For example, in billing any E/M service, including Nursing Facility Care services, Medi-Cal providers are to use the current version of the CPT Manual and "report E&M code definitions carefully."[28] Depending on the level of the NF facility, Medi-Cal limits the frequency of physician visits to NF patients.[29] In those "unusual circumstances" that require visits in excess of the frequencies set forth under Medi-Cal's rules, providers must include justification for the additional visits in their claim submissions.[30]

92.     Under Hawaii's Medicaid program, E/M services provided in SNFs or long-term care facilities are payable, subject to certain limitations.[31] When billing for E/M services furnished

---

[27] *Evaluation and Management (E/M)*, Noridian (last updated Aug. 13, 2021), https://med.noridianmedicare.com/web/jeb/specialties/em (emphasis in original).

[28] *Medi-Cal Providers Manual: Part 2 - General Medicine, Evaluation & Management (E&M)* at p. 1, DHCS (revision date Dec. 16, 2021), https://files.medi-cal.ca.gov/pubsdoco/publications/masters-mtp/part2/eval.pdf.

[29] *See id.* at p. 12.

[30] *Id.*

[31] *See Hawaii Medicaid Provider Manual: Chapter 6 - Medical/Surgical Services* § 6.12, State of Hawaii Dep't of Human Servs. (Jan. 2011), https://medquest.hawaii.gov/en/plans-providers/fee-for-service/provider-manual.html.

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

to Medicaid beneficiaries in the SNF or NF setting, providers must follow proper coding requirements as described in the most current edition of the CPT Manual.[32] Notably, "[d]aily or frequent routine visits to stable patients at the acute waitlisted subacute, SNF or ICF LOC will not be covered."[33]

93.    In New Mexico, to bill any service, eligible providers agree to comply with all federal and state laws, regulations, and executive orders relevant to the provision of services. Providers must also follow New Mexico Medicaid's program rules and instructions, as well as program directions and billing instructions. NMAC § 8.302.1.11. Providers are also responsible for following coding manual guidelines and CMS correct coding initiatives, including not improperly unbundling or upcoding services. *Id.* § 8.312.2.11.

94.    For E/M services furnished to Washington Medicaid beneficiaries in the nursing facility setting, providers must use either the 1995 or 1997 E/M Guidelines to determine the appropriate level of service.[34] Providers must follow the coding guidelines in the CPT Manual and their documentation must support the particular E/M level billed.[35] Although the 1995 or 1997 E/M Guidelines are referenced for use in determining the appropriate level of service, the guidelines themselves state that providers "should refer to CPT for the complete descriptors for E/M services and instructions for selecting a level of service."[36] In the NF setting, Washington's Medicaid program limits reimbursable physician E/M visits to two per month for a resident-beneficiary.[37]

95.    Since 2019, Defendants have submitted and/or caused the submission of claims for NF care E/M services furnished to Medicare and Medicaid recipients residing in Daiya's partner facilities.

---

[32] *Id.* § 6.12.1.
[33] *Id.* § 6.12.2.2(b).
[34] *See Physician-Related Services/Health Care Professional Services Billing Guide* at p. 53 (Wash. State Health Care Authority (July 1, 2021), https://www.hca.wa.gov/assets/billers-and-providers/Physician-related-serv-bg-20210701.pdf.
[35] *Id.*
[36] *1995 Documentation Guidelines for Evaluation and Management Services* at p. 3, CMS https://www.cms.gov/outreach-and-education/medicare-learning-network-mln/mlnedwebguide/downloads/95docguidelines.pdf (last visited Apr. 25, 2022); *see supra* note 23 at p. 4.
[37] *See supra* note 34 at p. 56.

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

**GENERAL ALLEGATIONS**

**A.   Daiya's Business**

96.   Daiya is a physician-owned multi-specialty provider group that contracts with SNFs/NFs and ALFs to provide post-acute and long-term care services to patients in those facilities.

97.   Daiya employs healthcare professionals, including board-certified physicians, nurse practitioners, registered nurses, pharmacists, and medical assistants, to work with its partner SNFs/NFs and ALFs in providing care to facility resident-patients. Several of Daiya's NPP providers also specialize in mental health, pain management, palliative care, and podiatry. According to Dr. Walia, by employing numerous and various types of healthcare providers, Daiya provides resources (e.g., night and weekend call coverage, scheduling staff, on-site liaisons, pharmacy services) that are not provided by its competitors in hopes of "improv[ing] the standard of medical care" in their partner facilities and "chang[ing] the standard of care in the industry at large."

98.   Daiya's providers are independent of its partner facilities; thus, the services Daiya providers furnish to facility-resident patients are separately billable and paid for under Medicare Part B. For Medicaid beneficiaries, Daiya providers are separately reimbursed based on the particular state's fee schedule rates. *See supra* ¶¶ 59, 79.

99.   Under its contracts, Daiya embeds providers in the partner-facilities. That is, Daiya's providers are essentially assigned to work in particular facilities on a daily basis. Depending on the location and facility size, Daiya providers can see patients at multiple facilities.

100.   To assist providers with scheduling patients, Daiya employs a series of staff members, who are either on-site at the facility or off-site in a back office, whose sole purpose is to look for ways to get patients at a particular facility on a provider's schedule. Daiya's "scheduling team," as management calls it, is comprised of Clinical Documentation Specialists, Scheduling Nurses, Medical Staffing Coordinators, and Chronic Care Management Nurses.

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

101.    Clinical Documentation Specialists (CDSs) are nurses with prior nursing home experience. The CDSs data mine patient charts in Daiya's centralized EMR system, GEHRIMED™, and make recommendations and comments geared toward creating care plans that the providers are then presumably responsible for reviewing and are to consider or address specifically before signing-off on the plans. The CDSs will also schedule future visits for SNF patients to be seen by a Daiya internist (physician or NPP), as well one of Daiya's NPP-specialists (e.g., psych or pain management). The CDSs are not on-site at the facilities but are located off-site in a remote back office. It is important to note that because CDSs are not on-site, the initial care plans they create and the visits they schedule are not based on any direct contact with the patient, but rather based on information that has been uploaded to GEHRIMED.

102.    Daiya's Scheduling Nurses scour patient records in GEHRIMED and review, among other items, the patient's vital signs, any imaging reports, nursing progress notes, lab results, medications, orders, and provider notes, in search of any "clinical issues" that would provide any reason to schedule a provider visit. The stated purpose of the Scheduling Nurses is that they "augment" the schedule and prevent things from "falling through the cracks." In practice, however, the Scheduling Nurses scour patient records to look for any reason to put a patient on a provider's schedule, even before the on-site facility nurses or even the on-site Daiya providers, who are in daily contact with the patients, have determined that a patient visit is medically necessary. The Scheduling Nurses schedule visits for providers and add the purported reason or reasons for the visit in the chief complaint section of the patient's chart. The Scheduling Nurses are instructed to include in the chief complaint section at least three diagnoses from the patient's past medical history, which comes from the records from the hospital or other previous facility. Providers are then instructed to review the notes input by the Scheduling Nurse and change them for every visit. Like the CDSs, the Scheduling Nurses are not on-site and the visits they schedule are not based on any direct contact with the patient, but rather based on information that has been uploaded to GEHRIMED.

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

103.    Daiya's Medical Staffing Coordinators (MSCs) are what the company considers to be the "Ambassadors" to each of its partner facilities. The MSCs are intended to work with the facility nursing staff to get updates on patient issues or any nursing concerns. The MSCs' primary job is also to facilitate all patient visits, including the regulatory visits, and to get patients on a provider's schedule. Like the Scheduling Nurses, when scheduling patients for providers, the MSCs are instructed to include in the chief complaint section at least three diagnoses from the patient's past medical history.

104.    Finally, Daiya's Chronic Care Management (CCM) nurses are part of the administrative staff located in Seattle that scour the patient records and look to develop monthly care plans for patients with chronic conditions. The CCM plans are reviewed and signed by Dr. Walia. If, upon reviewing a patient's record, CCM nurses have particular concerns for a patient that they feel need to be addressed, they will schedule a visit for the on-site Daiya provider and put their purported concern or question in the chief complaint section of the patient notes.

105.    For every new skilled patient in a partner facility, in addition to the mandated physician visits, the CDSs schedule a slew of visits based upon a pre-determined timeline that are to occur over the first four weeks upon admission to the SNF. These visits are scheduled even before any initial assessment has been made by a Daiya provider.

106.    During the first week upon admission, the CDSs schedule the initial visit by a Daiya provider, who is either an internal medicine/primary care NPP or a physician; a follow-up visit by the internal medicine/primary care provider; a pain evaluation; and a psych evaluation for a total of four visits. In week two the patient is to be seen three times a week; in week three, the patient is to be seen two times a week; and in week four and on-going, the patient is to be seen four times a week.

107.    Management's rationale for the high number of visits within the first four weeks is to prevent readmission to the hospital within the first 30 days in the SNF, thus exposing the SNF to penalties from CMS. Even after the first 30 days, visits are frequently scheduled under the guise of "high quality" care.

COMPLAINT & JURY DEMAND
FILED UNDER SEAL - 24

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

108.     Providers that broach the topic of medical necessity, or lack thereof, are met with a stern response from management that they are not being thorough enough, and they are to stick to their schedules because, as management purports, the SNF residents are "very sick people," which is a gross exaggeration to say the least. The providers are then warned that they will be monitored closely. Even if providers, who are in direct contact with the patients, know their patients are stable and are on a stable treatment plan, which most are, their patients will be placed on their schedule and are not to be removed.

109.     Between all the various ways Daiya's scheduling team puts patients on a provider's schedule, a provider may have up to 16 patients per day on their schedule. At one point, Daiya even incentivized providers with a periodic bonus if they saw 20 patients per day consistently. But Daiya ended this program because they changed course and no longer thought it to be realistic, nor did they want to pay the bonus.

110.     No matter how a patient gets on a provider's schedule or how many patients are on their schedule, once a patient is scheduled, the provider must see the patient. Providers have no discretion to remove patients from the schedule, even if a visit is not medically necessary.

111.     During a mandatory provider meeting in or about early January 2021, in which management discussed its patient scheduling policy, Dr. Walia told providers:

Uh, one, one thing I would like to say. We don't want, um, encounters that you've got scheduled for, for tomorrow, or for today moved to the future. We want that to really be only done in exceptional circumstances.

And the reason for that is . . . we find that when, uh, when those encounters are moved to the future quite often issues fall through the cracks, and then we expose the facility to, uh, you know, not meeting certain regulatory requirements.

So, if you're sched . . . you know, we're looking at every, every provider's schedule every single day. ***You're required to see the patients that, that you're scheduled to see.*** (emphasis added).

112.     The real reason management does not want providers, like Relator, to move or remove patients from their schedules is because any decrease in patient visits means decreased revenues for Daiya.

113.     In the face of decreasing Medicare reimbursements going into 2021 as well as having to navigate through the Public Health Emergency caused by COVID-19 which had been on-going since March 2020, Daiya sought to make up any short falls in revenues by leaning on providers to have them see as many patients as possible, as frequently as possible (i.e., "gang rounding"), and to ensure that those patient encounters are billed at the highest reimbursement levels possible.

114.     A majority of Daiya's providers are recent graduates of nursing programs or are doctors fresh out of residency. Management takes advantage of these employees' relative lack of practice experience and banks on their naivety in having them do whatever they instruct them to do—i.e., see every patient on their schedule and get every visit to reflect the highest billing levels, and do so without question.

115.     As detailed below, Daiya pushes their providers to engage in upcoding and gang rounding. Daiya's business model further imposes additional encounters on patients that are not medically unnecessary. All of the conduct alleged herein has led to and continues to result in the submission of false claims.

**B.      Upcoding Visits**

**1.      Daiya's Documentation and Coding "Training"**

116.     On December 12, 2020, Daiya's CEO, Dr. Walia, sent an "urgent" company-wide email alerting employees that the company was going to undertake changes to increase revenues in the face of decreased reimbursement rates effective January 1, 2021, for the services Daiya was furnishing to patients in its partner facilities.

117.     In his December 12, 2020 email, Dr. Walia informed employees the company would be making "significant changes . . . within our current staffing model" as a direct result of CMS's decision "to cut reimbursement for physician and practitioners in skilled nursing facilities by 10.2% effective January 1, 2021"[38] as well as a "dwindling patient census in many of our current

---

[38] The *CY [Calendar Year] 2021 Medicare Physician Fee Schedule Final Rule* (the "2021 MPFS Final Rule") was published in the Federal Register on December 2, 2020 and had finalized 10% cuts to practitioner payments for E/M services, including those furnished in nursing facilities, assisted living, and home health that were to be effective on January 1, 2021. *See Physician Fee Schedule*, CMS (page last modified Mar. 9, 2022),

COMPLAINT & JURY DEMAND
FILED UNDER SEAL - 26

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

facilities." Dr. Walia stated that certain clinicians might have facilities added to their schedules "to help them be more productive." Dr. Walia further stated the need for "all providers to see the patients they are scheduled to see" and the need to have "documentation done timely. We will not be able to allow non[-]compliance with this and will be monitoring this much more closely, than previous [sic]." The last point Dr. Walia made in his email was to inform employees that "many providers will be going through coaching on documentation" and that the company had "identified multiple providers who's [sic] documentation does not meet our quality standards and whom we would like to provide teaching to about this."

118.    On December 31, 2020, Relator was informed in an email from Dr. Walia that Relator was among the providers identified whose documentation apparently was not meeting Daiya's "quality standard" and that Relator, along with the other identified providers, had to participate in a "Mandatory Education Session" to address their documentation.

119.    Relator's "education" training session took place in January 2021, on a video conference call with Daiya's Director of Education, Morgan Cunningham. Relator was informed during this training session that all of the patient visits during the prior fall that Relator had coded either at a low (CPT 99308) or moderate (CPT 99309) complexity should have been documented to make them appear to be at high complexity (CPT 99310).

120.    Typically, an E/M service is coded and billed based on the complexity of the visit. The more complex the visit, the higher the level of code that can be billed.[39] The E/M codes that correspond with subsequent nursing facility care services reflect the level of complexity—99307 (straightforward), 99308 (low), 99309 (moderate), 99310 (high). The higher the code, the higher the reimbursement.

---

https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/PhysicianFeeSched. However, the full 10% decrease did not actually go into effect because on December 27, 2020, the Consolidated Appropriations Act of 2021 was enacted and modified the 2021 MPFS Final Rule by providing a 3.75% increase in MPFS payments, including payments for nursing facility services, for CY 2021. *See id.* The overall impact of the legislation decreased the reimbursements of the Subsequent Nursing Facility codes primarily at issue in this case, CPT 99307–99310, by less than 2% on average. *See CMS Releases Updated Conversion Factor for CY 2021*, AMDA (Jan. 8, 2021), https://paltc.org/publications/cms-releases-updated-conversion-factor-cy-2021. Apparently, Daiya employees were never informed of the new legislation nor its *de minimis* impact on E/M NF care reimbursements.
[39] *See supra* note 20 at p. 7.

COMPLAINT & JURY DEMAND
FILED UNDER SEAL - 27

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

121.    To bill any E/M code, the services furnished must meet the definition of the code. A provider must ensure that the E/M code selected reflects the services furnished. There are several factors that go into the rationale for each complexity level. For example, a high complexity visit would be one wherein a patient was unstable with a condition in which the outcome was in doubt, and who may even require being sent to the emergency room.

122.    During the January 2021 session, it quickly became clear to Relator that this mandatory education session that Relator and the other identified providers were being forced to attend was intended to teach them how to "bloat" their documentation—i.e., over-document—as the means to bill their E/M visits at CPT 99310, which has the highest reimbursement rate. As Ms. Cunningham told Relator, "We get reimbursed for the higher level codes."

123.    In response to Relator's question as to whether the company was looking for Relator to "bill more 99310s than 99309s," Ms. Cunningham said, "Yeah," and then explained Daiya's rationale for coding at the highest E/M level as follows: "We're trying to kind of show people how to improve um their documentation because most of the time we're all putting in the work already for a 310, it's just that the documentation needs a little bit of tweaking." Indeed, Daiya's focus was on getting the documentation, not medical necessity or the services actually furnished, to support the billing.

124.    Through these training sessions like the one Relator had with the Director of Education, Daiya sought to re-wire their providers' thinking on coding and billing in a way geared towards maximizing revenues for the company. Management presented their belief that any E/M service could be billed at the highest level if their providers documented their E/M services to the meet the standard for the highest level. Accordingly, Daiya trained its providers to transform the simplest of visits in which a patient was currently stable, into a comprehensive visit of high complexity by, for example, listing all of the patient's comorbidities to make it appear the provider was managing every single one.

125.    During Relator's January 2021 training session, Ms. Cunningham used a patient example to illustrate to Relator how Daiya wanted their providers to complete their documentation

COMPLAINT & JURY DEMAND
FILED UNDER SEAL - 28

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

to "get to a level 10" visit. Daiya employs a database of macros, each one specific for a general patient-condition (e.g., generalized weakness, essential hypertension), that providers were to use to document the patient's "Plan" (i.e., plan of care) based on the patient visit. There were also worksheets the providers could use to ensure that their documentation would support a level 10 visit. In going through one of the worksheets, Ms. Cunningham explained:

> [I]t's separated into history, exam, and medical decision making and you can kind of just like check the boxes, 'okay, I got these,' or, um, if you are coding for a level, _**trying to get a level 10**_ if you're discussing 3 different issues, um that makes your history a level 10. (emphasis added).

> Or, are your getting the review of systems, you have these 3 in there, and you can move onto the exam and making sure that you're hitting 9 systems with 2 bullets each . . . . Um, and like I said I usually just focus on my history and exam, and then it doesn't matter what my medical decision making is.

126.    Daiya's view on documentation was summed up by Ms. Cunningham as follows:

> _**It doesn't really matter the complexity of the visit. It matters what's in your note when it comes down to CPT coding.**_ So if you have, you know, a thorough history, a complete review of systems, you have a comprehensive physical exam, even if you do nothing in your medical decision making, you can still code that a level 10. (emphasis added).

127.    In a follow-up email to Ms. Cunningham shortly after the training session, Relator explained how Relator had been using 99310 for E/M services with patients:

> Generally I've used the 99310 for high complexity visits that required much work / time and increased medical decision making. I may need to change the way I am thinking about the coding process?

128.    On January 20, 2021, Ms. Cunningham emailed in response that she agreed with how Relator used 99310, but also agreed with Relator's assessment that in order to comply with Daiya's documentation standards, Relator needed to shift thinking about 99310 from "high complexity" to just "'high' in general." Ms. Cunningham wrote:

> Yes, I think it may just be a mental shift in the way coding is done. It definitely seems like 99310 would be for high complexity decision making, but another way to think about it is just "high" in general. If you are thorough and detailed in your history and do a complete exam, those are high level or complex. It took a "higher" amount of time than a basic HPI and [physical exam]. And for established patients (all follow-ups/non-admission visits) we only need to meet 2/3 components — usually history and exam as those are generally easier to meet.

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

In regards to new admissions, the MDM also only needs to meet 2/3. With new patients, we are usually seeing them for multiple problems, reviewing old records, reviewing labs, etc. — this can meet "high" level MDM because of the amount of time and effort spent, not necessarily "complexity".

129.    Daiya's Director of Education was essentially telling Relator that every visit should be coded and billed at the highest level regardless of the patient's condition and actual service furnished, and that Relator could do so by merely documenting a "thorough" history and exam as those are the two of three components of an E/M visit that are easiest to meet to get to a 99310. Put another way, if Relator could make the history and exam sections of a patient's chart look like a complex visit for which Relator had to spend a lot of time on—i.e., if Relator could bloat the notes—then Relator could and should always bill a level 10 visit.

130.    Of course, as CMS states, the volume of documentation is not determinative of the specific level of service to bill.[40] And, as Relator knows well, to bill a level 10 visit (CPT 99310) or any E/M service, a provider must first consider medical necessity as well as the severity of the patient's condition—i.e., whether "the patient may be unstable or may have developed a significant new problem requiring immediate physician attention."[41] Not surprisingly, given Daiya's focus on documentation, the "education" session given to providers, including Relator, failed to include any mention of taking into account the patient's condition or even the services actually furnished.

## 2.    Daiya's Documentation and Coding "Training" Was Successful

131.    In the months after receiving Daiya's documentation and coding "training," nearly all the providers who received the training implemented Daiya's directives and sharply increased their utilization of the highest E/M level, CPT 99310, even if providers had been coding and billing a majority of their E/M services at CPT 99309, the next highest level. For the most part, with the exception of a few of the more experienced physicians and NPPs, the training sessions worked.

132.    The simplest way to demonstrate the success of Daiya's training is by viewing a specific provider's utilization data for CPT codes billed over the course of months. On average per

---

[40] See supra note 17 § 30.6.1.
[41] See Current Procedural Terminology (CPT), AMA (2021) (CPT 99310 description).

COMPLAINT & JURY DEMAND
FILED UNDER SEAL - 30

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

month, over 80% of Daiya's NPP encounters and approximately 50% of its physician encounters billed are for subsequent nursing facility care E/M services, CPT 99307–99310. Below are graphs from a sample of six exemplar providers who received the training session in January 2021, like the one given to Relator. The data for each provider below comes from Daiya's EMR system and tracks the number of patient encounters billed for each level of E/M service furnished to established facility resident-patients:





KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384





KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1
2
3
4
5
6
7
8
9
10



11
12
13
14
15
16
17
18
19
20



21   133.   Each of the providers whose encounter data is depicted above received the

22   documentation and coding training session that Relator received in or about January 2021. Each

23   provider's utilization and billing of the highest level E/M code, CPT 99310, went from minimal

24   usage prior to the training session to almost exclusive use and billing at this level afterwards.

25   Conversely, each provider's utilization and billing of the lower level E/M codes, CPT 99308 or

26   CPT 99309, went from high levels of usage prior to the training sessions to significantly lower

27   levels of usage and billing afterwards.

COMPLAINT & JURY DEMAND
FILED UNDER SEAL - 33

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

134.    The documentation and coding training session given to Relator and other providers in January 2021 was not a one-time offering. Rather, this training is mandatory whenever management deems a provider is not meeting its documentation standards.

135.    And, as demonstrated in the examples in paragraph 132 above, it can be determined when a provider was given the training. For example, Carol Schaffer, an ARNP who was hired in or about June 2021 and furnishes nursing facility care services to patients at a Daiya partner-facility in Rio Rancho, New Mexico, had apparently not been coding and billing enough of her E/M services at CPT 99310 when she started working for Daiya. Like the providers depicted in the examples in paragraph 132 above, based upon her low usage of CPT 99310, Ms. Schaffer was required to undergo the documentation and coding training. Like the providers depicted in the examples in paragraph 132 above, Ms. Schaffer immediately increased her coding and billing of 99310 and decreased her coding and billing at the lower CPT levels:



136.    It should be noted that the E/M codes, CPT 99307–99310, are for visits *subsequent* to the admission or initial visit to the *same* patient. Unlike the SNF/NF setting, in the doctor's office setting, a physician or physician practice may have hundreds or even thousands of unique established patients who are seen by the practice physicians periodically—e.g., an annual physical, the flu. And although physicians in the office setting may have a full schedule of patients every

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

day, they rarely see the same patient every day. In the SNF/NF setting, after the admission or initial visit, the patient remains in the facility and the patient population varies little on a day-to-day basis. In other words, the change in CPT utilization by Daiya's providers as demonstrated in the examples above is based on encounters primarily for the same patients that are oftentimes seen for the same conditions and usually over the course of a few months.

137.    Most of the providers, once trained, sustained their high level of billing at the highest E/M level. Shown below are graphs based on the data from three of the providers described above in paragraph 132, who are exemplary of the majority of Daiya's 100-plus providers who furnish services to patients, that illustrate each provider's encounters by CPT code as a percentage of the CPT code category for which those encounters were billed over the six-month period from May to October 2021. CPT 99304–99306 (left three codes) are for nursing facility new patient admissions; CPT 99307–99310 (right four codes) are the subsequent nursing facility care E/M codes:[42]



---

[42] Although the CPT codes primarily at issue in this care are CPT 99307–99310, Daiya's coding and documentation training applies to all of the E/M-related codes that Daiya commonly bills to Medicare and Medicaid, including CPT 99304–99306 (initial facility care), CPT 99324–99327 (new patient domiciliary, rest or custodial care), CPT 99334–99337 (established patient domiciliary, rest or custodial care), and CPT 99441–99443 (telehealth service).

COMPLAINT & JURY DEMAND
FILED UNDER SEAL - 35

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384





138.    As shown above, the providers coded and billed between 70-80% of their encounters at the highest E/M level, CPT 99310, while coding and billing between 20-30% of their encounters at CPT 99309. No E/M services were billed at either CPT 99307 or 99308. This is in stark contrast to the 2012 National Average reported in the same graph which shows CPT 99310 was billed at approximately 10% of the subsequent nursing facility E/M services for established patients, and a majority of the E/M services being billed at CPT 99308 (*compare* red *with* blue lines above).

COMPLAINT & JURY DEMAND
FILED UNDER SEAL - 36

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

139.    Although it appears from the graphs above in paragraph 137 that Daiya uses the 2012 National Average as the comparative data for its providers (*see* light blue lines above), the graphs above would be nearly identical if the 2019 National Average was used instead. Using the Medicare Part B provider and utilization data available from CMS for calendar year 2019,[43] which is the latest calendar year for which this data is available, a similar analysis of unique providers that billed each of the CPT codes 99307–99310 in the facility setting reveals a distribution similar to the 2012 National Average as follows:[44]



140.    As shown above in paragraph 137, the three exemplar Daiya providers sustained their high level of billing CPT 99310 as a result of the training they received at the beginning of the year. Comparing Daiya's own data for these same three providers for all of calendar year 2021 to the National Average for calendar year 2019, further illustrates the stark contrast between Daiya's providers and the rest of the country in billing E/M services for established patients in NFs:

---

[43] *See Medicare Physician & Other Practitioners – by Provider and Service*, CMS (2019) https://data.cms.gov/provider-summary-by-type-of-service/medicare-physician-other-practitioners/medicare-physician-other-practitioners-by-provider-and-service.

[44] Under the same analysis for each of the calendar years from 2013 to 2018, the national average for nursing home encounters billed at the E/M CPT codes 99307–99310 shows an average distribution similar to calendar year 2019 shown above, with CPT 99308 being the most commonly billed (and reimbursed) E/M service and CPT 99310 being the least commonly billed (and reimbursed) E/M service furnished by providers who billed each of the CPT codes in the facility setting during the calendar year. There is no reason to believe that an analysis for calendar years 2020 and 2021 would show a significantly different distribution.

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384



141.   The trend in the utilization of the E/M codes CPT 99307–99310 shown for the three exemplar Daiya providers above in paragraphs 137 and 140 can also be seen across a majority of Daiya's 100-plus employee-providers that furnish E/M services to patients in its partner facilities.

142.   To put this in perspective, an analysis of Medicare's data for calendar year 2019, as depicted in the two preceding graphs, indicates that for providers nationwide who billed for each E/M level, CPT 99307–99310, the most commonly billed CPT code for subsequent nursing facility care visits was CPT 99308, a mid-level code which accounts for approximately 42% of a provider's subsequent nursing facility care encounters. The second most commonly billed encounter was CPT 99309 which accounts for approximately 38% of a provider's subsequent nursing facility care encounters. The Medicare data further reveals that providers billed CPT 99310, the highest E/M level of subsequent nursing facility care, only about 9% of the time.

143.   At Daiya, however, billing for subsequent nursing facility care encounters lies far outside the National Average for calendar year 2019. A large majority of Daiya's 100-plus employee-providers bill approximately 70%, or more, of their E/M encounters at CPT 99310, the highest level. Most of the other 30% of Daiya's subsequent nursing facility visits are billed at CPT 99309, the second-highest level. Very few visits are billed at the mid-level or lower-level codes CPT 99307–99308.

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

144.    Such disparity should raise a red flag. This is especially true since there is no evidence that Daiya's patient population is sicker than the average patient residing in a SNF or NF in the United States. There is nothing to indicate that Daiya's patient population across its 90-plus facilities being seen by its 100-plus employee-providers is so much sicker than the rest of the country that it warrants billing CPT 99310 at eight times the national average.

145.    Indeed, as demonstrated in the examples above, Daiya's training sessions achieved the intended result—to get its providers to bill at the highest E/M level possible in order to maximize revenues.

### 3.    Daiya's Documentation and Coding Training in Practice

146.    There is no question that Daiya's uniform training sessions and directives prompted Daiya's providers to change their billing practices to increase CPT utilization and billing of level 10 visits. Again, this was the case even if providers had been previously coding and billing most of their E/M services at CPT 99309. Of course, one only needs to know that CPT 99310 garners a nearly 50% higher reimbursement rate than CPT 99309 to understand why Daiya trained their providers as it did.[45]

147.    How each provider implemented the lessons learned was also uniform in practice—using pre-populated macros for treatment plans based on particular diagnoses in conjunction with the apparent use of the copy and paste functions within the EMR system to bloat the patient's chart. And while Daiya may not have trained providers to explicitly copy and paste (or clone) notes from one visit to the next, and while there is nothing wrong with the use of pre-populated macros

---

[45] For example, the Medicare National Payment Amounts for 2021 under the Part B Physician Fee Schedule for CPT 99307–99310 were as follows:

| CPT Code | Facility Price |
|----------|----------------|
| 99307    | $43.97         |
| 99308    | $69.09         |
| 99309    | $91.07         |
| 99310    | $135.04        |

*See Search the Physician Fee Schedule*, CMS (data updated Apr. 1, 2022), https://www.cms.gov/medicare/physician-fee-schedule/search?Y=1&T=0&HT=1&CT=0&H1=99307&H2=99308&H3=99309&H4=99310&M=5.

COMPLAINT & JURY DEMAND
FILED UNDER SEAL - 39

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

and templates to promote efficiency, there is no doubt that Daiya's training led providers to bloat their documentation.

148.    The following examples below illustrate how Daiya providers implemented management's documentation lessons.

### *Patient JP*

149.    Patient JP,[46] was a SNF patient at Daiya's partner facility, Porthaven Healthcare Center, in Portland, Oregon during the February to April 2021 time-period. Patient JP was admitted for rehab on or about February 19, 2021, following a hospital stay during which Patient JP underwent a left carotid endarterectomy.

150.    Despite that fact that during at least seven encounters conducted by a Daiya nurse practitioner, Patient JP "[d]enie[d] having any concerns this visit," had no real changes in the plan of care to warrant a high complexity visit, nor had any new orders been given that would demonstrate any level of medical decision making, all of these encounters were billed at level 10 (CPT 99310). And from the very first visit by the nurse practitioner provider shortly after admission, it was clear from the provider's notes that Patient JP was relatively stable. The provider even noted that the facility nursing staff "has no concerns." In short, none of these acute encounters should have been billed under CPT 99310, let alone whether these visits were medically necessary in the first place. All such claims submitted by Daiya for the services furnished to Patient JP that were purportedly furnished at level 10 were false.

151.    And because of management's pressure on providers to maximize revenues, including pressure to see every patient that the MSCs or CDSs put on their schedules, even if it was the same patient just seen days before, providers were left with little choice but to bloat patient notes to make it appear as if the E/M services qualified for the highest level when, in truth, they did not.

---

[46] The examples herein are of actual patients treated by Defendants' employee-providers during the relevant time-period. Each patient's individually identifiable health information has been masked in accordance with the Health Insurance Portability and Accountability Act ("HIPAA"). 42 U.S.C. § 1320d; 45 C.F.R. §§ 160.103, 164.514(b)(2)(i), (c).

COMPLAINT & JURY DEMAND
FILED UNDER SEAL - 40

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

152.   In Patient JP's case, it is evident the notes were bloated to qualify the encounters as level 10 visits. For example, on February 22, 2021, three days after admission to the SNF, Patient JP was seen by a Daiya nurse practitioner for the initial visit at the SNF. Although the documentation from this particular encounter indicates that the nurse practitioner had evaluated and was managing several diagnoses, a closer look reveals that the patient "[did] not have any concerns" and denied having pain, fever, chills, cough, dysnea, orthopnea, chest pain, palpitations, or other abnormalities. In other words, Patient JP was stable. Nevertheless, the nurse practitioner used the diagnoses from the patient's past history (from the hospital records) and included them in the Diagnosis and Assessment section of the patient notes, thus making it appear as if all of the diagnoses were being managed that day by the provider.

153.   In the Plan (i.e., plan of care) section of the notes for the February 22 visit, the provider used Daiya's macros to complete the care plan for each of the diagnoses cloned from the Past History section. As the patient was stable, there was no medical decision making to be done, let alone any medical decision making of high complexity. Nevertheless, the Daiya provider billed this encounter as a level 10 service.

154.   In subsequent visits from the same Daiya nurse practitioner, the nurse practitioner noted, at best, one new issue or diagnosis each time, but then included two or three existing diagnoses cloned from prior visits, and for which the treatment plans did not change. Thus, although the notes for the current visit indicated that the nurse practitioner was treating and managing several diagnoses, and thus qualified for level 10 billing, the nurse practitioner only treated the one new issue that made the visit arguably "necessary."

155.   Such was the case for the March 30, 2021 visit in which this same Daiya nurse practitioner saw Patient JP for "right groin pain, CHF, polymyalgia rheumatica, psoriatic arthritis." The right groin pain condition was the only real, new condition for which the provider had reason to see Patient JP. The other diagnoses—CHF, polymyalgia rheumatica, psoriatic arthritis—had already been noted in prior visits and the treatment plans for each were simply cloned for this visit. In addition, the Daiya provider cloned the Physical Exam notes from the visit before and perhaps

made changes, if any, to those systems actually examined, if examined at all. With the notes bloated to qualify billing the visit at level 10, the claim submitted by Daiya for this service purportedly furnished to Patient JP at level 10 based on those notes was false.

156.     A week later, on April 6, 2021, the same Daiya nurse practitioner saw Patient JP for "afib, CHF, polymyalgia rheumatica, psoriatic arthritis." These diagnoses were not new, and no new orders were given in the treatment plans, which were simply cloned for this visit. The nurse practitioner also cloned the Physical Exam notes from prior visits. With the notes bloated to qualify billing the visit at level 10, the claim submitted by Daiya for this service purportedly furnished to Patient JP at level 10 based on those notes was false.

### *Patient TAR*

157.     Patient TAR, was a long-term care patient at Daiya's partner facility, Arcadia Medical Resort in Renton, Washington during the late-April to August 2021 time-period. Patient TAR was admitted back to Arcadia for continued medical management and rehabilitation on or about April 26, 2021, following a hospital stay for acute hypoxic respiratory failure secondary to congestive heart failure exacerbation.

158.     On or about July 30, 2021, Patient TAR was seen by a Daiya physician for one of the mandated follow-up visits. During this visit, the Daiya physician documented a comprehensive history discussing three diagnoses, as well as noted a comprehensive exam. The physician also noted that the patient "reports feeling well," that the nursing staff had "no new issues to report," and the physician observed the patient to be "in no acute distress and comfortable." Accordingly, no new orders were given and in the plan for each of the three diagnoses discussed in the history, the physician noted the patient was to continue with the current plan, including taking the prescribed medications for each diagnosis, and that the nursing staff was to continue monitoring the patient. In other words, Patient TAR was stable. Nevertheless, because the physician noted a comprehensive history and physical exam, despite the relatively basic medical decision making and the patient's stable condition, the visit was billed at level 10.

COMPLAINT & JURY DEMAND
FILED UNDER SEAL - 42

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

159.    A week later, on August 4, a Daiya nurse practitioner saw Patient TAR for an acute "rehab follow-up" visit. The nurse practitioner noted that Patient TAR had "no acute complaints" as well as how the patient was progressing in therapy. The nurse practitioner cloned the physical exam notes from the July 30 visit, noting one additional observation in the exam for the cardiovascular system. The nurse practitioner also cloned the three diagnoses and plans for those diagnoses from the mandated follow-up visit the week before, making virtually no changes to the plans. The nurse practitioner added four diagnoses taken from the patient's past history and utilized the pre-populated macro plans for each of those diagnoses.

160.    Looking at the notes from the August 4 visit in isolation, it would appear the nurse practitioner had done much work during this visit. However, it is clear the notes were bloated to get to a level 10 visit by making it appear that much work had been done and that more diagnoses were being managed over the prior visits. At best, notwithstanding the note bloating, this visit should have been billed at no more than level 9 (CPT 99309), and likely should have been billed at level 8 (CPT 99308). Thus, the claim submitted by Daiya for this level 10 E/M service purportedly furnished to Patient TAR was false.

161.    This same Daiya nurse practitioner made three more acute visits to Patient TAR—on August 11, August 18, and August 19.

162.    For the August 11 visit, the nurse practitioner saw Patient TAR for a rash, including the diagnosis in the Assessment section of the notes and including a simple new order to treat the rash. This was the only condition the provider addressed during the visit. However, the notes indicated a comprehensive physical exam was performed and that the provider was also treating the patient for essential hypertension, COPD, and generalized weakness. But the notes for the Physical Exam and Plan sections for these additional diagnoses were cloned from the August 4 visit. Indeed, the notes were bloated to get this visit to a level 10. At best, notwithstanding the note bloating, this visit should have been billed at no more than level 9 (CPT 99309), and likely should have been billed at level 8 (CPT 99308), or even a level 7 (CPT 99307). Thus, the claim submitted by Daiya for this level 10 E/M service purportedly furnished to Patient TAR was false.

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

163.     For the August 18 visit, the same nurse practitioner saw Patient TAR for knee pain and prescribed Tylenol. This was the only condition the provider addressed during the visit. However, the notes indicate a comprehensive physical exam was performed and that Patient TAR was also being treated for essential hypertension, COPD, and peripheral vascular disease. But the notes for the physical exam, as well as the plans for these additional diagnoses were simply cloned from parts of the August 4 and August 11 visits. Indeed, the notes were bloated to get this visit to a level 10. At best, notwithstanding the note bloating, this visit should have been billed at no more than level 9 (CPT 99309), and likely should have been billed at level 8 (CPT 99308), or even a level 7 (CPT 99307). Thus, the claim submitted by Daiya for this level 10 E/M service purportedly furnished to Patient TAR was false.

164.     The very next day, on August 19, the same nurse practitioner went back to see Patient TAR, but this time to re-certify the patient for skilled nursing services. This recertification visit could have been done the day before when the provider saw the patient for knee pain, but because a MSC scheduled the visit, the provider had no choice but to conduct the recertification visit as scheduled. A separate visit to recertify the patient for skilled services meant another visit that Daiya could bill. The only difference between this recertification visit and the prior visits was that the provider noted, "Patient continues to make progress in therapy. Patient continues to require skilled services for which [nurse practitioner] will certify and recertify patient to continue to receive skilled services to his benefit." Nothing new was included in the notes and virtually all of the notes for the recertification visit were cloned from prior visits. As with the notes from the prior visits discussed above, the notes for the August 18 visit were bloated to get to a level 10 visit by making it appear that much work was done and that more diagnoses were being managed than the simple diagnosis being managed that day. At best, notwithstanding the note bloating, this visit should have been billed at no more than level 9 (CPT 99309), and likely should have been billed at level 8 (CPT 99308), or even a level 7 (CPT 99307). Thus, the claim submitted by Daiya for this level 10 E/M service purportedly furnished to Patient TAR was false.

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

165.    Other examples that evidence similar patterns of documenting and upcoding visits to level 10 by Daiya providers include:

| | Patient | Facility | Time Period in Facility | Number of Acute Visits Billed at Level 10 CPT 99310 |
|---|---|---|---|---|
| a. | RT | Issaquah Nursing & Rehab Center Issaquah, WA | End-January to End-April 2021 | 16 of 22 visits Although this patient did have several conditions and is of higher risk, this patient was also stable under the current treatment plan without many medical interventions to justify billing CPT 99310 for these 16 acute visits. |
| b. | WC | Sequim Health and Rehabilitation Center Sequim, WA | End-March to Early-May 2021 | 7 of 10 visits Patient's notes indicate this patient was stable with no new complaints under the current treatment plan, yet 7 of the 10 acute visits were still billed at CPT 99310. |

166.    Note bloating facilitated by the use of pre-populated macros in conjunction with cloning notes from prior visits enabled Daiya providers to upcode their encounters to level 10, even if the provider only saw the patient for a simple diagnosis and prescribed a simple course of action. It is very easy to record a "comprehensive" history and a "comprehensive" physical exam to get to a level 10 using Daiya's documentation methods. The same holds true for medical decision making—any medical decision making can be made to be of high complexity so long as a provider used the pre-populated macros.

167.    Completeness in documenting patient encounters is a sure-fire way to ensure a healthcare provider's appropriate reimbursement from health insurers. However, promoting documentation and coding methods that would ensure the padding of reimbursements, as Daiya

does, results in upcoding from bloated notes—and the submission of false claims—and leads to the perverse result of payments based on how much is in a patient's record as opposed to payments based on medical necessity and the level of service actually furnished to patients.

**C.    Medically Unnecessary Services**

**1.    "Gang" Visits / Hebuigh Frequency E/M Services**

168.    In concert with note bloating to ensure billing E/M services at the highest levels, Daiya also required its providers to see their patients as frequently as possible.

169.    Under normal circumstances, patients newly admitted to a SNF are mandated to be seen by a physician or qualified NPP at least once every 30 days for the first 90 days from admission, and then at least once every 60 days thereafter. 42 C.F.R. § 483.30(c)(1), (c)(4), (f).

170.    At Daiya, however, in addition to the mandated visits, management instructed providers, including Relator, to visit their patients several times a week. Such highly frequent visits avails Daiya the opportunity to triple or even quadruple the payments it gets from Medicare and Medicaid.

171.    CMS calls such highly frequent visits "gang visits" and warns that "[c]laims for an unreasonable number of daily E/M visits by the same physician [or authorized NPP] to multiple patients at a facility within a 24-hour period may result in medical review to determine medical necessity for the visits."[47] Daiya's internal coding team has even cautioned that "[f]requency of visits is definitely something providers and facilities need to be aware of."

172.    Even though subsequent facility care E/M services are "per day" services—i.e., a provider is allowed to bill one E/M service per patient per day—Daiya takes advantage of the fact that their providers are embedded in their partner facilities as well as the fact that there is no express limit for which a provider can bill an E/M service for any one patient in any one time-period.

173.    The only limitation on the frequency of the subsequent facility care E/M services that Daiya furnishes is medical necessity. Towards that end, Daiya's scheduling team (MSC, CDS, or scheduling nurse) scours the EMR system to look for *anything* in a patient's record that would

---

[47] *See supra* note 17 § 30.6.13(G).

COMPLAINT & JURY DEMAND
FILED UNDER SEAL - 46

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1    pass as a reason to put the patient on a provider's schedule. Daiya characterizes these types of

2    visits "acute" visits, which are visits for literally anything, most of which need no medical

3    evaluation.

4         174.    For Daiya, an acute visit would be warranted for a patient that, for example, had a

5    new bruise, or refused lunch, or had a cut without an infection, or refused compression socks. An

6    acute visit would also be warranted for any and every fall a patient has, even if the facility nursing

7    staff states the patient is "without apparent injury," or the patient him or herself denies any injuries

8    and pain from the fall.

9         175.    Daiya's frequent visits are far from the standard practice when typically, a primary

10   care/internal medicine provider (either a physician or NPP) would see a patient based on a true

11   change in condition or when the facility nursing staff informs the provider that the patient has had

12   a change in status that would warrant such a visit.

13        176.    Daiya seeks to justify the high frequency in visits by claiming that they are creating

14   a new practice standard that involves "high quality" care. But high frequency does not equate to

15   high quality. Rather, high frequency in visits, along with note bloating as described above, results

16   only in higher and more frequent payments for Daiya.

17        177.    In addition to illustrating how notes were bloated to get a provider's documentation

18   to support the E/M level billed, several of the patient examples above also illustrate the high

19   frequency with which Daiya providers saw their patients even though they all were stable.

20        178.    For example, Patient JP (*see supra* ¶¶ 149–156) was seen by Daiya providers no

21   less than 20 times—two of which were the federally mandated visits, one was an "Advanced Care

22   Planning" visit, and the rest (17) of which were acute visits. All, but two of the acute visits were

23   billed at CPT 99310.

24        179.    Patient TAR (*see supra* ¶¶ 157–164) had at least 16 acute visits, a majority of which

25   were billed at CPT 99310, within a four-month period.

26        180.    Patient RT (*see supra* ¶ 165) had at least 16 acute visits, all of which were billed at

27   CPT 99310, within a three-month period.

COMPLAINT & JURY DEMAND
FILED UNDER SEAL - 47

181.    Relator has patients in only one facility, which has a census of less than 75 patients. Previous outside providers who furnished NF services at Relator's facility would visit the facility once a week, maybe twice a week depending on the patient volume. Upon contracting with Daiya, however, Relator was forced to see all the patients every day. On average, Relator sees ten acute care patients up to three times a week; the rest are long-term care patients. For Relator to follow management's directives—to get the documentation to a level 10 visit and to see patients at a high frequency—it would be difficult to not call into question why Relator sees the same patients, who are otherwise stable, over and over. As the MAC covering Daiya's jurisdiction (Noridian) has even advised, "[t]he mere presence of inactive or chronic conditions does not constitute medical necessity for any setting (home, rest home, office, etc.)." *See supra* ¶ 88 & n.26. And by attempting to resist management's directive to get visits to level 10, Relator would be one of the exceptions at the risk of being terminated.

182.    To be sure, there are times when a patient does need more attention and needs to be seen more frequently, but usually not multiple times a week in the SNF/NF setting. And if the patient was actually unstable, a SNF or NF might not be the best place for that patient.

183.    Furthermore, even if these highly frequent visits could be deemed medically necessary, it is highly unlikely that they could also be billed at the highest E/M levels as a vast majority of them were.

## 2.    Automatic Specialty Visits

184.    Yet another way Daiya provides medically unnecessary visits is by forcing specialty encounters on SNF residents. Daiya bills specialty encounters as acute E/M visits (usually at CPT 99310) even though the only service furnished is nothing more than a screening intended to determine whether a patient has a further need for specialty services.

185.    While most of the providers that Daiya employs are primary care/internal medicine physicians or NPPs, Daiya also employs NPPs that specialize in, for example, psych or pain management. Other specialty-type services provided by Daiya include palliative care and cardiology screenings. Daiya's specialty services are usually furnished via telemedicine.

COMPLAINT & JURY DEMAND
FILED UNDER SEAL - 48

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

186.     Normally in the post-acute care setting, a primary care/internal medicine provider would screen the patient and determine if a referral to a specialist was medically necessary. Or perhaps the SNF-employed nurses or staff would conduct such a screening upon a patient's admission to the SNF and recommend a referral for a specialty consultation, providing a reason why the specialist would be necessary.

187.     As mentioned above, CDSs schedule a slew of visits for every new skilled patient admitted to a Daiya partner facility that are intended occur over the first four weeks upon admission. *See supra* ¶ 106. Visits by Daiya's specialty providers (e.g., psychiatric mental health nurse practitioners, nurse practitioners certified in pain management) are among those visits that are automatically scheduled.

188.     For example, CDSs automatically schedule a psych screening regardless of necessity for every patient whose record has any mention of a mental health-related diagnosis— e.g., dementia, depression, anxiety—even if the patient is currently stable with no symptoms presented during hospitalization or rehabilitation.

189.     And though the mere existence of a condition that is otherwise inactive does not constitute medical necessity (*see supra* ¶ 88), Daiya justifies the necessity of specialty visits as being part of its "high-quality" care model. In fact, however, as demonstrated below, these visits are intended to do nothing more than build up a large volume of unnecessary and duplicative visits.

### ***Patient WC***

190.     Patient WC, was a SNF patient at one of Daiya's Washington partner facilities for an approximate 6-week period from late-March to early-May 2021. Patient WC was admitted to the SNF on or about March 24, following an acute hospital stay for a heart condition and back surgery.

191.     On or about March 26, 2021, Patient WC was seen by a Daiya internal medicine physician for the mandated admission visit. Among other things, the physician performed a depression screen noting Patient WC was "negative for depression." Despite this finding and there being no other indication in Patient WC's record that any psychiatric evaluation was warranted, a

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

*second* depression screen was scheduled and then furnished anyway on April 9, 2021, by a Daiya NPP psych specialist. Absent any indication by the SNF staff that Patient WC had any psychiatric concerns in the period between the admission visit and this second depression screening, the second depression screen was not medically necessary and the claim Daiya submitted for this E/M service was false.

### *Patient WB*

192.   Patient WB, was a SNF patient at one of Daiya's Hawaii partner facilities during the April-May 2021 time-period. Patient WB was admitted to the SNF acute care on or about April 1, following a hospital stay during which Patient WB was treated for cellulitis. During this two-month period, following Daiya's "high-quality" care model, Patient WB was seen by Relator at least seven times, at least one other visit was the federally mandated visit, and one was an initial psychiatric evaluation and depression screen. In total, Patient JK had 17 visits during this period.

193.   Even though the patient notes from the on-site Daiya NPP contained no indication that a psychiatric evaluation was warranted, nor did Patient WB's record contain any current or past diagnoses of any psychiatric condition, a depression screen was scheduled and then furnished anyway on May 5, 2021, by a different Daiya NPP mental health specialist. The specialist provider even noted during the depression screen that Patient WB stated she was as "'psychologically sound as they come.'" Absent any prior indication by Relator or the SNF staff that Patient WB had any psychiatric concerns, the depression screen was not medically necessary and the claim Daiya submitted for this E/M service was false. It should further be noted that this depression screen, acute visit was billed at level 10.

### *Patient JK*

194.   Patient JK, was a SNF patient at one of Daiya's Hawaii partner facilities during the May-June 2021 time-period. Patient JK was admitted to the SNF acute care on or about May 4, following a hospital stay during which Patient JK was treated for a syncopal fall, diarrhea (which resolved itself while in the hospital), and pulmonary hypertension. During this two-month period, following Daiya's 'high-quality' care model, Patient JK was seen by Relator at least nine times,

COMPLAINT & JURY DEMAND
FILED UNDER SEAL - 50

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1    one other visit was the federally mandated visit, and one was a "depression screen." In total, Patient
2    JK had 18 visits.

3        195.    Even though the patient notes from the on-site Daiya NPP contained no indication
4    that a psychiatric evaluation was warranted, a depression screen was scheduled and then furnished
5    anyway on June 14, 2021, by a Daiya NPP mental health specialist. The specialist-provider's notes
6    from the depression screen even indicated that Patient JK "denie[d] any history of depression.
7    [Patient JK] also denie[d] any acute or chronic mental health conditions." Absent any prior
8    indication by Relator or the SNF staff that Patient JK had any psychiatric concerns, the depression
9    screen was not medically necessary and the claim Daiya submitted for this E/M service was false.
10   It should further be noted that this depression screen, acute visit was billed at level 10.

11              ***Patient EC***

12       196.    Patient EC, was a SNF patient at one of Daiya's Hawaii partner facilities during the
13   June 2021 time-period. Patient EC was admitted to the SNF acute care on or about June 2, 2021,
14   following a hospital stay during which Patient EC was treated for trigeminal neuralgia, CHF, and
15   atrial fibrillation. During June 2021, following Daiya's "high-quality" care model, Patient EC was
16   seen by Relator at least nine times, two other visits were the federally mandated visits, and one
17   was a "depression screen."

18       197.    Even though the patient notes from the on-site Daiya NPP contained no indication
19   that a psychiatric evaluation was warranted, a depression screen was scheduled and furnished
20   anyway on June 15, 2021, by a Daiya NPP mental health specialist. The specialist-provider's notes
21   from the depression screen indicated, predictably, that Patient EC "[did] not present with any
22   [symptoms] of depression." Absent any prior indication by Relator or the SNF staff that Patient
23   EC had any psychiatric concerns, the depression screen was not medically necessary and the claim
24   Daiya submitted for this E/M service was false. It should further be noted that this depression
25   screen, acute visit was billed at level 10.

26       198.    The above examples of medically unnecessary psychiatric screening visits illustrate
27   a pattern and practice throughout all of Daiya's partner facilities. Even though the specialist-

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1    providers in each of the above-examples could have determined upon review of the record that the

2    depression screen was not necessary, because Daiya's scheduling team booked the encounters and

3    providers are not to alter their schedule, the specialist-providers had no choice but to fulfill the

4    visits.

5         199.    At best, perhaps one or two patients a month might fall within the parameters for a

6    psychiatric evaluation/screening, but not every patient at every one of Daiya's partner-facilities.

7         200.    In Relator's experience working in over 30 SNFs, a SNF-employed social worker

8    has usually conducted the depression screen upon admission. In fact, a depression screen is one of

9    the required assessments a SNF must conduct upon a patient-resident's admission. *See* 42 C.F.R.

10   § 483.20. Thus, whether a Daiya physician performs the screening at the admission visit, or the

11   facility staff performs the screening upon admission, the separate psych evaluation that Daiya

12   automatically schedules and then furnishes under the guise of an acute E/M visit is not only

13   medically unnecessary, but the separate psych evaluation is also duplicative.

14                  ***Patient MM***

15        201.    Patient MM, was a patient at one of Daiya's Washington partner facilities during

16   the August 2020 to May 2021 time-period. During this time period, Patient MM was seen regularly

17   by a Daiya provider for pain management services even though the provider's notes indicated that

18   the patient's pain was controlled with no current complaints of pain at each visit. The notes further

19   indicated that Patient MM was being given Tylenol and no changes to that plan of care were made.

20   Absent any prior indication by the provider or the SNF staff that Patient MM had any pain concerns

21   to warrant an E/M service, the pain management encounters were not medically necessary and the

22   claims Daiya submitted for these services were false.

23        202.    Like the psych screening examples above, Daiya automatically schedules pain

24   management visits for every SNF rehab patient like Patient MM.

25        203.    Not only does Daiya's practice of automatically scheduling specialty visits lead to

26   encounters that are not medically necessary, but they are also duplicative because the types of

27   screenings furnished by Daiya providers are already done by either the primary care/internal

COMPLAINT & JURY DEMAND
FILED UNDER SEAL - 52

medicine provider at the time of admission, such as was the case with Patient WC (*see supra* ¶¶ 190–191), or are done by the SNF staff.

**D.     Defendants Caused False Claims to be Submitted and Paid for by Medicare and Medicaid**

204.   In the manner discussed above, Defendants submitted or caused the submission of false claims to Medicare and/or Medicaid through their improper conduct. Defendants were aware that their conduct was improper and/or did not comply with Medicare's or Medicaid's requirements.

205.   Based upon the foregoing and in the manner alleged, Defendants knowingly caused the submission of thousands of false claims during the relevant period that were not properly payable by the Medicare and Medicaid programs in the amount paid.

206.   As a result, Defendants' actions were the direct and proximate cause of false claims being submitted to and paid by the Medicare and Medicaid programs thereby damaging the United States and the relevant States.

<div align="center">

**CAUSES OF ACTION**

**COUNT ONE — SUBMISSION OF FALSE CLAIMS**
**31 U.S.C. § 3729(a)(1)(A)**

</div>

207.   Relator incorporates by reference Paragraphs 1 through 206 above as if fully set forth in this Paragraph.

208.   Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval to the United States in violation of 31 U.S.C. § 3729(a)(1)(A). That is, Defendants knowingly presented or caused to be presented to the United States through the Medicare and Medicaid programs reimbursement claims for nursing facility care E/M services furnished to patients at Daiya's partner facilities that were for a higher level of service than actually furnished (i.e., upcoded), or for the reimbursement of specialty screening services or other E/M services that were otherwise not medically necessary.

209.   By virtue of the false or fraudulent claims that Defendants presented or caused to be presented, the United States suffered damages.

COMPLAINT & JURY DEMAND
FILED UNDER SEAL - 53

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

210.     Defendants are liable to the United States for treble damages under the FCA, in an amount to be determined at trial, plus a civil penalty for each claim of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, *see* 15 C.F.R. § 6.3(a)(3) (setting forth the current civil penalties level of not less than $12,537 and not more than $25,076 for violations of the FCA), for each false claim Defendants presented or caused to be presented.

### COUNT TWO — MAKING FALSE STATEMENTS IN THE SUBMISSION OF FALSE CLAIMS
### 31 U.S.C. § 3729(a)(1)(B)

211.     Relator incorporates by reference Paragraphs 1 through 206 above as if fully set forth in this Paragraph.

212.     Defendants knowingly made, used, or caused to be made or used false statements material to the payment or approval of claims by the United States through the Medicare and Medicaid programs in violation of 31 U.S.C. § 3729(a)(1)(B). That is, by employing a policy that directed Defendants' employee-providers to over-document (i.e., bloat) notes from patient encounters, the providers were enabled to code, and thus enabled Daiya in turn to bill, E/M services at higher levels than were actually furnished. All such bloated documentation falsely qualified the E/M services to be billed at a higher level of service than was actually furnished or medically necessary. All such bloated documentation was material to the Medicare and Medicaid programs' decisions to pay those claims Daiya submitted. Had the United States known that Defendants caused their providers to bloat documentation from patient encounters, resulting in providers bloating their documentation in fact, it would not have paid such claims in the amounts paid.

213.     By virtue of the false or fraudulent claims that Defendants presented or caused to be presented, the United States suffered damages.

214.     Defendants are liable to the United States for treble damages under the FCA, in an amount to be determined at trial, plus a civil penalty for each claim of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, *see* 15 C.F.R. § 6.3(a)(3) (setting forth the current civil penalties level of not less than $12,537 and

COMPLAINT & JURY DEMAND
FILED UNDER SEAL - 54

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1   not more than $25,076 for violations of the FCA), for each false claim Defendants presented or

2   caused to be presented.

### COUNT THREE — CALIFORNIA FALSE CLAIMS ACT
### Cal. Gov't Code § 12651(a)(1)
### Submission of False Claims

5   215.   Relator incorporates by reference Paragraphs 1 through 206 above as if fully set

6   forth in this Paragraph.

7   216.   This is a claim for treble damages and civil penalties under the CalFCA, Cal. Gov't

8   Code §§ 12650, *et seq.*

9   217.   As alleged herein, Defendants violated Cal. Gov't Code § 12651(a)(1) by

10  knowingly presenting or causing to be presented a false or fraudulent claim for payment or

11  approval to the State of California, acting through the Medi-Cal program, for the reimbursement

12  of nursing facility care E/M services furnished by Defendants' employee-providers that were for

13  a higher level of service than actually furnished (i.e., upcoded), or for the reimbursement of

14  specialty screening services or other E/M services that were otherwise not medically necessary.

15  218.   By reason of these payments, the State of California has been damaged, and

16  continues to be damaged, in a substantial amount to be proven at trial.

### COUNT FOUR — CALIFORNIA FALSE CLAIMS ACT
### Cal. Gov't Code § 12651(a)(2)
### Use of False Records or Statements

19  219.   Relator incorporates by reference Paragraphs 1 through 206 above as if fully set

20  forth in this Paragraph.

21  220.   This is a claim for treble damages and civil penalties under the CalFCA, Cal. Gov't

22  Code §§ 12650, *et seq.*

23  221.   As alleged herein, Defendants violated Cal. Gov't Code § 12651(a)(2) by

24  knowingly making, using, or causing to be made or used a false record or statement material to a

25  false or fraudulent claim paid or approved by the State of California, acting through the Medi-Cal

26  program, for the reimbursement of nursing facility care E/M services furnished by Defendants'

27  employee-providers to individual patient-beneficiaries.

COMPLAINT & JURY DEMAND
FILED UNDER SEAL - 55

222.    By reason of these payments, the State of California has been damaged, and continues to be damaged, in a substantial amount to be proven at trial.

## COUNT FIVE — HAWAII FALSE CLAIMS ACT
### Haw. Rev. Stat. § 661-21(a)(1)
### Submission of False Claims

223.    Relator incorporates by reference Paragraphs 1 through 206 above as if fully set forth in this Paragraph.

224.    This is a claim for treble damages and civil penalties under the HFCA, Haw. Rev. Stat. §§ 661-21, *et seq.*

225.    As alleged herein, Defendants violated Haw. Rev. Stat. § 661-21(a)(1) by knowingly presenting or causing to be presented a false or fraudulent claim for payment or approval to the State of Hawaii, acting through the Medicaid program, for the reimbursement of nursing facility care E/M services furnished by Defendants' employee-providers that were for a higher level of service than actually furnished (i.e., upcoded), or for the reimbursement of specialty screening services or other E/M services that were otherwise not medically necessary.

226.    By reason of these payments, the State of Hawaii has been damaged, and continues to be damaged, in a substantial amount to be proven at trial.

## COUNT SIX — HAWAII FALSE CLAIMS ACT
### Haw. Rev. Stat. § 661-21(a)(2)
### Use of False Records or Statements

227.    Relator incorporates by reference Paragraphs 1 through 206 above as if fully set forth in this Paragraph.

228.    This is a claim for treble damages and civil penalties under the HFCA, Haw. Rev. Stat. §§ 661-21, *et seq.*

229.    As alleged herein, Defendants violated Haw. Rev. Stat. § 661-21(a)(2) by knowingly making, using, or causing to be made or used a false record or statement material to a false or fraudulent claim paid or approved by the State of Hawaii, acting through the Medicaid program, for the reimbursement of nursing facility care E/M services furnished by Defendants' employee-providers to individual patient-beneficiaries.

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

230.    By reason of these payments, the State of Hawaii has been damaged, and continues to be damaged, in a substantial amount to be proven at trial.

### COUNT SEVEN — NEW MEXICO MEDICAID FALSE CLAIMS ACT
### NM Stat. Ann. § 27-14-4(A)
### Submission of False Claims

231.    Relator incorporates by reference Paragraphs 1 through 206 above as if fully set forth in this Paragraph.

232.    This is a claim for treble damages under the NMMFCA, NM Stat. Ann. §§ 27-14-1, *et seq.*

233.    As alleged herein, Defendants violated NM Stat. Ann. § 27-14-4(A) by knowingly presenting or causing to be presented a false or fraudulent claim for payment or approval by the State of New Mexico under the Medicaid program for the reimbursement of nursing facility care E/M services furnished by Defendants' employee-providers that were for a higher level of service than actually furnished (i.e., upcoded), or for the reimbursement of specialty screening services or other E/M services that were otherwise not medically necessary.

234.    By reason of these payments, the State of New Mexico has been damaged, and continues to be damaged, in a substantial amount to be proven at trial.

### COUNT EIGHT — NEW MEXICO MEDICAID FALSE CLAIMS ACT
### NM Stat. Ann. § 27-14-4(C)
### Use of False Records or Statements

235.    Relator incorporates by reference Paragraphs 1 through 206 above as if fully set forth in this Paragraph.

236.    This is a claim for treble damages under the NMMFCA, NM Stat. Ann. §§ 27-14-1, *et seq.*

237.    As alleged herein, Defendants violated NM Stat. Ann. § 27-14-4(C) by knowingly making, using, or causing to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the State of New Mexico under the Medicaid program for the reimbursement of nursing facility care E/M services furnished by Defendants' employee-providers to individual patient-beneficiaries.

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

238. By reason of these payments, the State of New Mexico has been damaged, and continues to be damaged, in a substantial amount to be proven at trial.

**COUNT NINE — NEW MEXICO FRAUD AGAINST TAXPAYERS ACT**
**NM Stat. Ann. § 44-9-3(A)(1)**
**Submission of False Claims**

239. Relator incorporates by reference Paragraphs 1 through 206 above as if fully set forth in this Paragraph.

240. This is a claim for treble damages and civil penalties under the NMFATA, NM Stat. Ann. §§ 44-9-1, *et seq.*

241. As alleged herein, Defendants violated NM Stat. Ann. § 44-9-3(A)(1) by knowingly presenting or causing to be presented a false or fraudulent claim for payment or approval to the State of New Mexico, acting through the Medicaid program, for the reimbursement of nursing facility care E/M services furnished by Defendants' employee-providers that were for a higher level of service than actually furnished (i.e., upcoded), or for the reimbursement of specialty screening services or other E/M services that were otherwise not medically necessary.

242. By reason of these payments, the State of New Mexico has been damaged, and continues to be damaged, in a substantial amount to be proven at trial.

**COUNT TEN — NEW MEXICO FRAUD AGAINST TAXPAYERS ACT**
**NM Stat. Ann. § 44-9-3(A)(2)**
**Use of False Records or Statements**

243. Relator incorporates by reference Paragraphs 1 through 206 above as if fully set forth in this Paragraph.

244. This is a claim for treble damages and civil penalties under the NMMFCA, NM Stat. Ann. §§ 44-9-1, *et seq.*

245. As alleged herein, Defendants violated NM Stat. Ann. § 44-9-3(A)(2) by knowingly making, using, or causing to be made or used a false, misleading or fraudulent record or statement to get a false or fraudulent claim paid or approved by the State of New Mexico, acting through the Medicaid program, for the reimbursement of nursing facility care E/M services furnished by Defendants' employee-providers to individual patient-beneficiaries.

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

246.   By reason of these payments, the State of New Mexico has been damaged, and continues to be damaged, in a substantial amount to be proven at trial.

**COUNT ELEVEN — WASHINGTON MEDICAID FRAUD FALSE CLAIMS ACT**
**RCW § 74.66.020(1)(a)**
**Submission of False Claims**

247.   Relator incorporates by reference Paragraphs 1 through 206 above as if fully set forth in this Paragraph.

248.   This is a claim for treble damages and civil penalties under the WMFFCA, RCW §§ 74.66, *et seq*.

249.   As alleged herein, Defendants violated RCW § 74.66.020(1)(a) by knowingly presenting or causing to be presented a false or fraudulent claim for payment or approval to the State of Washington, acting through the Apple Health program, for the reimbursement of nursing facility care E/M services furnished by Defendants' employee-providers that were for a higher level of service than actually furnished (i.e., upcoded), or for the reimbursement of specialty screening services or other E/M services that were otherwise not medically necessary.

250.   By reason of these payments, the State of Washington has been damaged, and continues to be damaged, in a substantial amount to be proven at trial.

**COUNT TWELVE — WASHINGTON MEDICAID FRAUD FALSE CLAIMS ACT**
**RCW § 74.66.020(1)(b)**
**Use of False Records or Statements**

251.   Relator incorporates by reference Paragraphs 1 through 206 above as if fully set forth in this Paragraph.

252.   This is a claim for treble damages and civil penalties under the WMFFCA, RCW §§ 74.66, *et seq*.

253.   As alleged herein, Defendants violated RCW § 74.66.020(1)(b) by knowingly making, using, or causing to be made or used a false record or statement material to a false or fraudulent claim paid or approved by the State of Washington, acting through the Apple Health program, for the reimbursement of nursing facility care E/M services furnished by Defendants' employee-providers to individual patient-beneficiaries.

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

254.   By reason of these payments, the State of Washington has been damaged, and continues to be damaged, in a substantial amount to be proven at trial.

<center>**PRAYER FOR RELIEF**</center>

**WHEREFORE**, Relator John Doe requests that judgment be entered against Defendants, ordering that:

A.   Defendants cease and desist from violating the federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, the California False Claims Act, Cal. Gov't Code §§ 12650, *et seq.*, the Hawaii False Claims Act, Haw. Rev. Stat. §§ 661-21, *et seq.*, New Mexico Medicaid False Claims Act, NM Stat. Ann. §§ 27-14-1, *et seq.*, New Mexico Fraud Against Taxpayers Act, NM Stat. Ann. §§ 44-9-1, *et seq.*, and the Washington Medicaid Fraud False Claims Act, RCW §§ 74.66, *et seq.*

B.   Defendants pay the United States not less than $5,000 and not more than $10,000 (as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990; 15 C.F.R. § 6.3(a)(3)) for each violation of 31 U.S.C. § 3729, plus three times the amount of damages the United States has sustained because of Defendants' misconduct;

C.   Defendants pay the State of California not less than $5,500, and not more than the greater of $11,000 for each violation of Cal. Gov't Code § 12651(a), plus three times the amount of Medicaid payments paid by the State of California because of Defendants' misconduct;

D.   Defendants pay the State of Hawaii not less than $5,500, and not more than the greater of $11,000 for each violation of Haw. Rev. Stat. § 661-21, plus three times the amount of Medicaid payments paid by the State of Hawaii because of Defendants' misconduct;

E.   Defendants pay the State of New Mexico three times the amount of Medicaid payments paid by the State of New Mexico for each violation of NM Stat. Ann. § 27-14-4 because of Defendant's misconduct;

F.   Defendants pay the State of New Mexico not less than $5,000, and not more than the greater of $10,000 for each violation of NM Stat. Ann. § 44-9-3, plus three times the amount of Medicaid payments paid by the State of New Mexico because of Defendants' misconduct;

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

G.      Defendants pay the State of Washington not less than $5,500, and not more than the greater of $11,000 for each violation of RCW § 74.66.020(1), plus three times the amount of Medicaid payments paid by the State of Washington because of Defendant's misconduct;

H.      Relator be awarded the maximum relator's share allowable pursuant to 31 U.S.C. § 3730(d), Cal. Gov't Code § 12652(g), Haw. Rev. Stat. § 661-27, NM Stat. Ann. § 27-14-9, NM Stat. Ann. § 44-9-7, and RCW § 74.66.070;

I.      Relator be awarded all costs of this action, including attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d), Cal. Gov't Code § 12652(g)(8), Haw. Rev. Stat. § 661-27, NM Stat. Ann. § 27-14-9, NM Stat. Ann. § 44-9-7(D), RCW § 74.66.070, and any other applicable law or regulation;

J.      Defendants be enjoined from concealing, removing, encumbering, or disposing of assets which may be required to pay damages, penalties, fines, attorneys' fees and costs awarded by the Court; and

K.      The United States; the States of California, Hawaii, New Mexico, Washington; and Relator be awarded such other, further or different relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

Respectfully submitted this 27th day of April 2022.

KELLER ROHRBACK L.L.P.

By: _____

Laura R. Gerber, WSBA #34981
1201 Third Avenue, Suite 3200
Seattle, Washington 98101
Telephone: (206) 623-1900
lgerber@kellerrohrback.com

*Local Counsel for Plaintiff-Relator
John Doe*

COMPLAINT & JURY DEMAND
FILED UNDER SEAL - 61

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384